**FILED**

**April 27, 2015**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 7:26 AM**



## COURT OF WORKERS' COMPENSATION CLAIMS
## DIVISION OF WORKERS' COMPENSATION

| | | |
|---|---|---|
| **Mario Mace,** | ) | **DOCKET #: 2015-06-0059** |
| **Employee,** | ) | **STATE FILE #: 88006-2014** |
| | ) | **DATE OF INJURY: November 4, 2014** |
| **v.** | ) | **Chief Judge Switzer** |
| **Express Services,** | ) | |
| **Employer, and,** | ) | |
| | ) | |
| **Sedgwick,** | ) | |
| **Carrier/TPA.** | ) | |

## EXPEDITED HEARING ORDER

THIS CAUSE came on to be heard on April 14, 2015, before the undersigned Workers' Compensation Judge upon the Request for Expedited Hearing filed by Mario Mace (Mr. Mace), the Employee, on March 23, 2015, pursuant to Tennessee Code Annotated section 50-6-239(d)(1) to determine if Express Services ("Express"), the Employer, is obligated to provide additional medical benefits. Considering the positions of the parties, the applicable law, and all of the evidence submitted, the Court concludes that Mr. Mace is entitled to the requested medical benefits.

## ANALYSIS

### Issues

1. *Whether Mr. Mace sustained an injury that arose primarily out of and in the course and scope of his employment with Express.*

2. *Whether Mr. Mace suffered from a preexisting condition that was aggravated by a work-related injury.*

3. *Whether Mr. Mace is entitled to additional medical care as recommended by a physician[1].*

---

[1] Near the outset of the Expedited Hearing, the Court observed that Mr. Mace raised as an additional issue whether Express should be sanctioned with regard to alleged violations of the Division's "Mediation and Hearing Procedures" governing utilization review as set forth in Chapter 0800-02-06. Both parties submitted position statements addressing the issue. The Court noted for the record that, in preparing for this hearing, it reviewed documents regarding Express pursuing utilization review by Sedgwick CMS of Dr. Petty's surgical request, as discussed *infra*. The Court observed that, in accordance with the Division's rules, it has no authority to assess

1

**Evidence Submitted**

The Court admitted into evidence the exhibits below:

1. Medical Records:
   - Horizon Medical Center, Emergency Room, November 4, 2014; MRI report, November 24, 2014
   - Petty Orthopaedics & Sports Medicine/Tennessee Orthopaedics Alliance (Dr. Petty), November 10, 2014-January 12, 2015
   - Star Physical Therapy, December 5, 2014-December 29, 2014
2. Employee's Supplemental Medical Records, Horizon Medical Center, Emergency Room, discharge instructions
3. Affidavit of Mario Mace
4. Affidavit of Denny Molsberry
5. Affidavit of Robert Francis
6. Affidavit of Paula Zolot
7. Form C-20, FROI, November 5, 2015
8. Form C-41, Wage Statement
9. Employee Mario Mace's Responses to Employer's Interrogatories
10. Photograph of similar line of bun carts
11. Photograph of forklift lined up to push racks into freezer
12. Photograph of individual indicating relative position of Mr. Mace's job duty
13. Drawing made by Robert Francis during testimony.

The Court designates the following as the technical record:

- Petition for Benefit Determination, February 6, 2015
- Dispute Certification Notice, March 20, 2015
- Request for Expedited Hearing, March 23, 2015
- Employee position statements, February 5, 2015, March 6, 2015, April 13, 2015
- Employer position statement, February 25, 2015; Supplemental Pre-Hearing Brief, April 8, 2015 (Includes Medical Chronology).

---

penalties. Tenn. Comp. R. & Regs., 0800-02-06-.10(1) (2014) ("Failure by an employer to comply with any requirement in this Chapter, 0800-02-06 … shall subject such party to a penalty … *at the discretion of the Administrator*" (emphasis added)). However, the Court may refer such issues to the Division's Penalty Program for investigation and potential action pursuant to Tenn. Comp. R & Regs, 0800-02-13-.02- .03 (2006). Express objected to the admissibility of written communications regarding its request for utilization review of the surgery, which objection the Court sustained as irrelevant to the remaining issues. Therefore, the Court did not consider any of the information provided in association with the utilization review documentation. The Court does note that, upon its issuance, a copy of this Order will be provided to the Penalty Program in accordance with Tenn. Comp. R. & Regs., 0800-02-24-.03 (2015) ("In addition to referrals made by a workers' compensation judge, any Division employee may refer any person or entity to the penalty program for the assessment of a civil penalty whenever the referring employee believes that there may have been a violation of the Division's rules or the Tennessee Workers' Compensation Act."). The Court reasonably believes there may have been a violation of the Division's rules.

The Court did not consider attachments to the above filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in the above filings or any attachments to them as allegations unless established by the evidence.

The following witnesses provided live, in-person testimony: Mr. Mace, Robert Francis and Denny Molsberry.

## History of Claim

### A. Alleged Incident

Mr. Mace is a forty-four (44) year-old resident of Humphreys County, Tennessee, who worked in shipping and receiving for Express.

On November 4, 2014, his work assignment was Tennessee Bun Company in Dickson. Mr. Mace's task was to help move two lines of sixteen (16) bakery carts on four-wheeled-dollies, side-by-side, each stacked with twenty-four (24) trays of buns. He was located at the front of the line being moved/pushed from the rear by a forklift. He, another Express employee, and the forklift driver, Robert Francis, attempted to move the stacks into a freezer. As the racks approached the freezer, a wheel on the front dolly caught on the freezer threshold, causing the wheel to fall off and the carts to buckle. Immediately prior, Mr. Mace extended his arms out to his sides at about shoulder height guiding the train of carts to keep them on the proper path as Mr. Francis pushed them into the freezer (*See* Ex. 12[2]). Mr. Mace testified that, after buckling, the carts moved outward in such a fashion as to push his left arm backward as he fell to the right. Trays of buns fell on his head and right shoulder. However, he immediately felt pain in his left shoulder.

Mr. Francis, an employee for Tennessee Bun Company, came to the aid of Mr. Mace. Mr. Francis helped him remove his jacket and inspected his left arm and shoulder. He then told Mr. Mace to go to the office. The two wrote statements, which are not a part of the record. Mr. Mace testified that the pain intensified to the point he required medical attention, which he sought later that evening at Horizon Medical Center, as described in greater detail further in this opinion.

Mr. Mace testified that he has difficulty holding objects, lifting with his left arm and raising the arm. He also has difficulty sleeping due to the pain. He stated the injury dramatically affects his daily life.

Mr. Mace additionally testified that he worked at a tavern, "The Wanted: Bar and Grill," as a doorman checking IDs and accepting cover charges, from December 2013 until October or November 2014. He also worked in the same role at "The Rendezvous: Bar and Grill" from early 2012 for a few months. Mr. Mace denied working as a bouncer in either establishment, noting that he does not hold a security license. He further denied involvement in any physical

---

[2] Subsequently during cross-examination, Counsel for Express introduced the photograph marked as Exhibit 12 for demonstrative purposes only, to show Mr. Mace's position relative to the bakery carts prior to the alleged incident. The parties agree the photo is not a depiction of Mr. Mace performing his former job duties.

altercations or sustaining any on-the-job injuries in either employment. He additionally denied ever working for a tavern called "The Wanted II."

On cross-examination, Mr. Mace said that Mr. Francis was driving the forklift approximately 30 feet away from him at the time of the incident. He conceded that his left shoulder was not literally pinned between anything when the alleged incident occurred, but it "felt like it was trapped behind me." He acknowledged that he worked as a bouncer/doorman in Chicago for approximately 18-20 years, during which time he was involved in four (4) "major" fights. He further acknowledged an inconsistency in his interrogatory answers (Ex. 9, p. 2) regarding his dates of employment with "The Wanted: Bar and Grill," but explained that he had forgotten that he worked a couple of nights in October 2014. Mr. Mace identified Exhibits 10, 11 and 12 as representative of the work area on the date of injury. On redirect, Mr. Mace said the last year that he worked as a bouncer in Chicago was 1991 or 1992.

Mr. Francis testified under subpoena on behalf of Express. On the alleged date of injury, from his position operating the forklift, he observed the right side of the carts where Mr. Mace was standing at the time the wheel came off the first cart. He confirmed that he observed the incident from about 32-35 feet away. He said he typically watches the racks from the right side to ensure that the racks do not "walk over," meaning that the middle racks do not move or buckle to the side when the forklift pushes the line. He does not look on the other side because a row (a railing) guides the stacks to the left. He testified that nothing blocked his view of Mr. Mace before the incident. While operating the forklift, he felt a "jerk," and he saw that about four or five of the stacks on the left side in the front:

> [A]ll fell like a tower straight. And then the first and second stack, and some of the stacks in the middle where they got buckled up had kind of like jumbled together. And the first stack had slid and fallen. That's what I seen is, I had thought I seen a stack fall and hit Mario. What I didn't get is I thought I seen it hit him on the far side of him... .

Mr. Francis testified that he did not see anything land on Mr. Mace's left shoulder. He said that he did not see Mr. Mace's arm being thrown, stretched or twisted backward, nor was Mr. Mace's left shoulder "pinned" between anything. Mr. Francis said the stacks did not obscure his view because they fell forward. Mr. Francis drew a diagram of the stacks, which indicated the positions of Mr. Mace, a co-worker and himself after the alleged incident took place (Ex. 13; *see* page 9, *infra*). He said the stacks did "come to the right a little bit, not too far." He later said the stacks did not "come out;" rather, they "separated." He explained that the stacks "sometimes walk a little bit," but, "[a]s far as, like, spreading all the way open and coming way out in the middle, no sir, that did not happen." He said that if stacks had pinned Mr. Mace's left arm, he would have had to move stacks out of the way to get to Mr. Mace, which he did not do. According to Mr. Francis, there were displaced racks to the right of Mr. Mace, but no displaced stacks to Mr. Mace's left. Mr. Francis testified that this led him to wonder if the accident occurred as Mr. Mace described it, but he did not voice any concerns at the time.

Mr. Francis stated that he came to Mr. Mace's aid after the incident. He removed Mr.

4

Mace's jacket and observed the left shoulder, which did not bear any marks or bruises other than a small indentation. Mr. Francis stated that Mr. Mace said he did not know whether the indentation was there before the incident. He told Mr. Mace to go to the break room, assuming Mr. Mace could return to work shortly. He testified that he did not believe Mr. Mace had injured himself, nor did he believe he needed medical care. He said he felt the incident was "blown out of proportion."

On cross-examination, Mr. Francis acknowledged he has no medical expertise and admitted he had no way of diagnosing an internal shoulder injury. He said he considers himself a co-worker to Mr. Mace rather than a supervisor.

Ms. Denny Molsberry also testified for Express. She works as a staffing consultant for Express. Her testimony revolved around conversations, which took place while Mr. Mace was working light duty in the office, about his work at "The Wanted" in November 2014. According to Ms. Molsberry, approximately one month later in December 2014, Mr. Mace told her that he worked at a bar called "The Wanted II." On cross-examination, she admitted to not personally having been to "The Wanted" for several years and did not have first-hand knowledge of his employment there. She admitted no personal knowledge of Mr. Mace's injury to his left shoulder, other than meeting him at the Horizon Emergency Room after the November 4, 2014 alleged incident.

Express additionally introduced the Affidavit of Paula Zolot (Ex.6), the front office coordinator for Express. Her affidavit related that Mr. Mace told her he worked as a bouncer for twenty-two (22) years and had been involved in four (4) major fights.

### B. Medical Treatment

Mr. Mace went to Horizon Medical Center emergency room on November 4, 2014. The Horizon medical record (Ex 1, p.1) indicates that he arrived at 21:45 (9:45) p.m. Notes from that visit state, "43 yo (sic.) male presents c/o left anterior shoulder pain x 3 hrs. pt reports pushing heavy cart of buns at tn pride when cart rolled back. Reports straining left shoulder... " (Ex. 1, p. 4). The notes additionally state, "Subjective Assessment: PT PUSHING SUPPLIES AT WORK AND 'ARM GOT THROWN BACKWARDS AT WORK AND SUPPLIES LANDED ON HIM AROUND 2115" (Ex. 1, p. 11) (capitalization in original). The x-ray report concluded, "Unremarkable shoulder examination" (Ex. 1, p. 10). PA Nathan Dotson diagnosed a shoulder strain (Ex. 1, p. 8). The arm was placed in a sling (Ex. 1, p. 15). It is undisputed that Express accommodated Mr. Mace with light-duty office work until his discharge in March 2015.

Express offered a panel, from which Mr. Mace chose Dr. Damon Petty as the authorized treatment provider (ATP). Mr. Mace saw Dr. Petty on November 10, 2014. The "history" portion of notes from that visit state that Mr. Mace was "pushing a cart of bread product down the hallway, had a wheel come off and the cart changed direction, dumped some of the trays on him and his left shoulder got caught and put into an abducted and externally rotated position" (Ex. 1, p. 27). Dr. Petty diagnosed left shoulder pain and a labral tear, ordered an MRI and restricted Mr. Mace to no use of his left arm. *Id.*

Dr. Petty's December 1, 2014 notes state that he reviewed the MRI results and saw "a partial thickness rotator cuff tear and a labral tear. Neither is dramatically significant. In other words, neither requires immediate surgical intervention" (Ex. 1, p. 36). Dr. Petty administered a subacromial injection and referred Mr. Mace to physical therapy. *Id.* He further wrote, "Mario's MRI shows both partial thickness rotator cuff tears and what looks like a chronic labral tear. These two injuries are unlikely to have been caused simultaneously" (Ex. 1, p. 37).

Mr. Mace participated in physical therapy from December 5, 2014, through January 9, 2015 (Ex. 1, pp. 59-90). Mr. Mace returned to Dr. Petty on January 12, 2015. Notes from that visit state, "His left shoulder is still bothering him. He has failed all conservative efforts to manage the shoulder" (Ex. 1, p. 52). Dr. Petty's "assessment" was "[l]eft shoulder rotator cuff tear, A.C. joint arthritis and probable biceps labral pathology" (Ex. 1, p. 54). For the "plan," Dr. Petty noted, "[l]eft shoulder arthroscopy, rotator cuff repair plus or minus biceps tenodesis and labral repair and A.C. joint." *Id.*

Express, through Counsel, sent Dr. Petty a "Medical Questionnaire" dated January 28, 2015[3] (*See generally,* Ex. 1, p. 56). In relevant part, it asked:

> In reviewing the imaging study performed on Mr. Mace's left shoulder, you noted that "Mario's MRI shows both partial thickness rotator cuff tears and what looks like a chronic labral tear. These two injuries are unlikely to have been caused simultaneously." In light of your impression, is it your opinion to a reasonable degree of medical certainty that the labral tear primarily arose out of Mr. Mace's employment with Express and particularly the incident on November 4, 2014?

Dr. Petty checked "no," and wrote, "It probably occurred earlier." The questionnaire further asked: "In light of your treatment in this case, is it your opinion to a reasonable degree of medical certainty that the need for the rotator cuff repair surgery arose primarily out of the bread cart incident occurring on November 4, 2014?" Dr. Petty checked "yes," and wrote, "It may have aggravated the labral tear too."

Express sent a follow-up "Medical Questionnaire" to Dr. Petty (*See generally,* Ex. 1, p. 58). It asked, "After reviewing the account of the incident that allegedly led to Mr. Mace's injuries in the Affidavit of Robert Francis, is this description consistent with the medical history and description of the incident that Mr. Mace provided you?" In Dr. Petty's March 24, 2015, response, he checked "no." The questionnaire further asked, "Based upon both the varying accounts of the incident allegedly causing Mr. Mace's injuries and your treatment in this case, can you state to a reasonable degree of medical certainty that Mr. Mace's left rotator cuff tear arose primarily out of the bread cart incident occurring on November 4, 2014?" Dr. Petty checked "no." Express declined to authorize additional physical therapy or surgery.

---

[3] The record contains the Medical Questionnaire with Dr. Petty's handwritten responses.

**Mr. Mace's Contentions**

Mr. Mace contends he sustained an injury arising primarily out of and in the course and scope of employment with Express when the stacks of trays on carts stopped and buckled as they were being pushed into the freezer, suddenly pushing his left arm and shoulder backward as he fell toward the right. He did not have any prior medical problems with his left shoulder. Although he worked part time as a doorman, he did not injure his shoulder in that position. Express failed to prove any intervening causes other than the incident at issue were responsible for the injury.

Mr. Mace asserts he is entitled to the surgery that Dr. Petty recommended. Dr. Petty provided the requisite opinion on causation in the January 28, 2015 Medical Questionnaire. Specifically, he stated in that document that the rotator cuff injury and labral tear are related to the November 4, 2014 incident because the incident "may have aggravated the labral tear too." The labral tear, if it existed before this injury, had no impact on Mr. Mace's ability to perform his work before the November 4, 2014 incident. Because the labral tear is related to the rotator cuff tear, Dr. Petty should repair both during the surgery.

**Express' Contentions**

Mr. Mace's injury is not work-related. Mr. Francis, who has no interest in the outcome, credibly testified that Mr. Mace did not injure himself on the date of the injury as Mr. Mace described. Mr. Mace worked a second job as a bouncer at a bar, where it is highly likely that he broke up no fewer than four (4) fights, as evidenced by Ms. Zolot's affidavit.

Dr. Petty's response to the most recent medical questionnaire expressed the opinion that he cannot say to a reasonable degree of medical certainty that the injury is work-related. Therefore, Express properly denied the claim. Should the Court determine that the rotator cuff tear is causally related to the alleged work injury, Express should not be liable for the nonwork-related labral repair. Dr. Petty's comment on the Medical Questionnaire that the alleged incident "may have aggravated the labral tear too" does not satisfy the statute's "primarily arising," or "51%," causation requirement. Mr. Mace has not satisfied his burden of proof because he did not show that he sustained a compensable injury.

**Findings of Fact and Conclusions of Law**

*Standard Applied*

The Workers' Compensation Law shall not be remedially or liberally construed in favor of either party but shall be construed fairly, impartially, and in accordance with basic principles of statutory construction favoring neither the employee nor employer. Tenn. Code Ann. § 50-6-116 (2014). Tennessee Code Annotated section 50-6-239(c)(6) provides that, "[u]nless the statute provides for a different standard of proof, at a hearing the employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence." Tenn. Code Ann. § 50-6-239(c)(6) (2014). A different standard of proof exists for the issuance of

7

interlocutory orders at expedited hearings than the standard of proof required at compensation hearings. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063 (Tenn. Work. Comp. App. Bd., March 27, 2015). A workers' compensation judge may enter an interlocutory order for medical or temporary benefits upon a determination that the injured employee would likely prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1) (2014); *McCall v. Nat'l Health Care Corp.*, 100 S.W.3d 209, 214 (Tenn. 2003).

*Factual Findings*

Mr. Mace sustained an injury to his left shoulder at work on November 4, 2014, while trying to guide a line of bakery carts placed upon four-wheeled dollies into a freezer. During this process, a wheel on the front dolly caught on the door threshold and came off, resulting in sudden force on Mr. Mace's left shoulder as he tried to keep the dollies in line. The incident caused a rotator cuff tear in his left shoulder. Dr. Petty, the ATP, opined that in addition to the rotator cuff tear, there is a labral tear in Mr. Mace's left shoulder, which likely was not injured contemporaneous to the rotator cuff tear, but may have been aggravated by the same event. Dr. Petty recommended surgery on January 12, 2015.

*Application of Law to Facts*

*1. Mr. Mace sustained an injury that arose primarily out of and in the course and scope of employment with Express.*

Tennessee Code Annotated section 50-6-102(13) (2014) defines "injury" and "personal injury" to mean an injury by accident "arising primarily out of and in the course and scope of employment ... ." Tenn. Code Ann. § 50-6-102(13)(A) (2014). An injury is "accidental" only if the injury is caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence[.] Tenn. Code Ann. § 50-6-102(13)(A) (2014). An injury "arises primarily out of and in the course and scope of employment" only if it has been shown "by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes[.]" Tenn. Code Ann. § 50-6-102(13)(B) (2014).

The Tennessee Supreme Court has consistently held that, in order to qualify as a compensable workers' compensation claim, an injury must both "arise out of" and occur "in the course of" employment:

> The phrase "in the course of" refers to time, place, and circumstances, and "arising out of" refers to cause or origin. "[A]n injury by accident to an employee is in the course of employment if it occurred while he was performing a duty he was employed to do; and it is an injury arising out of employment if caused by a hazard incident to such employment." Generally, in injury arises out of and is in the course and scope of employment if it has a rational connection to the work and occurs while the employee is engaged in the duties of his employment.

8

*Cloyd v. Hartco Flooring Co.,* 274 S.W.3d 638, 643 (Tenn. 2008)(*quoting Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991).

In this case, Mr. Mace credibly testified that the front-stack dolly wheel caught on the freezer threshold, causing the dollies to buckle and push his left arm backward. Mr. Mace offered sufficient detail regarding how the accident occurred, including the time and place of occurrence. He became injured in the course of employment because the accident took place while he was guiding stacks, a duty he was employed to do. The injury arose from his employment because the falling stacks are a hazard incident to his employment. A rational connection exists between Mr. Mace's injury and his work, and the injury occurred while Mr. Mace was engaged in the duties of his employment. Moreover, Mr. Mace's testimony is generally consistent with the accounts of the injury that he gave to the ER providers at Horizon Medical Center (Ex. 1, pp. 4, 11) and Dr. Petty (Ex. 1, p. 27).

Undeniably, Mr. Mace's version of the mechanism of injury conflicts with the testimony of Mr. Francis, who testified that he did not see Mr. Mace's left arm being thrown, stretched or twisted backward as a result of the falling stacks. There is no dispute that the stacks of bread that fell from the racks fell on Mr. Mace's right side. Mr. Mace admits such. Mr. Mace credibly testified that the pressure of the forklift pushing the buckled carts forced his left arm/shoulder backward. Further, it is significant to the Court that Mr. Francis' own drawing (Ex. 13) depicts another employee standing between Mr. Francis and Mr. Mace when the incident occurred (*See* Appendix 1). The Court notes, moreover, that Mr. Francis' testimony is inconsistent regarding the extent to which stacks of trays buckled outward and to the right, potentially blocking his view of the falling stacks.

The statute additionally requires: "An injury causes ... the need for medical treatment only if it has been shown to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing ... [the] need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(13)(C) (2014). Except in "the most obvious, simple and routine cases," a workers' compensation claimant must establish by expert medical testimony that he or she is injured and that there exists a causal relationship between the injury and the claimant's employment activity. *Wheetley v. State,* 2014 Tenn. LEXIS 476, No. M2013-01707-WC-R3-WC (Tenn. Workers' Comp. Panel, June 25, 2014) (*citing Excel Polymers, LLC v. Broyles,* 302 S.W.3d 268, 274 (Tenn. 2009); *Cloyd v. Hartco Flooring Co.,* 274 S.W.3d 638, 643 (Tenn. 2008)).

In this case, Dr. Petty unambiguously opined that a causal link exists in his February 2, 2015 response to the Medical Questionnaire (Ex. 1, p. 55). Specifically, the Questionnaire states: "In light of your treatment in this case, is it your opinion to a reasonable degree of medical certainty that the need for the rotator cuff repair surgery arose primarily out of the bread cart incident occurring on November 4, 2014?" Dr. Petty checked "yes," and wrote, "It may have aggravated the labral tear too."

Express, it appears, attempted to nullify his answer to Question #3 through a second Medical Questionnaire (Ex 1, p. 58), which asked: "Based upon both the varying accounts of the

incident allegedly causing Mr. Mace's injuries and your treatment in this case, can you state to a reasonable degree of medical certainty that Mr. Mace's left rotator cuff tear arose primarily out of the bread cart incident occurring on November 4, 2014?" In Dr. Petty's March 24, 2015, response, he checked "no."

In the Court's view, the question does not attempt to elicit an expert medical opinion. Rather, it asks if the varying factual accounts of the accident lead Dr. Petty to change his opinion regarding causation. Dr. Petty seems to conclude that, since Mr. Francis' account is different from Mr. Mace's account, he cannot reach a causation conclusion. However, implicit in the question is the assumption that the affiant's account (in this instance, Mr. Francis) of the incident is more accurate than Mr. Mace's version of how he became injured. Based on Mr. Mace's version of the facts, Dr. Petty clearly found a causal relationship. Based on Mr. Francis' account, he cannot find a causal relationship. However, Dr. Petty possesses no direct knowledge regarding Mr. Francis's testimony at this hearing, nor is it his role to make such determinations. The Court finds Mr. Mace to be very credible in his relation of the factual circumstances giving rise to his injury. The Court places no weight upon Dr. Petty's March 24, 2015 response to the second Medical Questionnaire. The Court has weighed the testimony on the factual events and finds Mr. Mace's account to be more credible.

Express additionally argued that Mr. Mace's injuries stem from his work as a bouncer. This argument is unpersuasive. Express offered no direct proof that Mr. Mace sustained injuries through his past work in taverns, but merely speculated that it must have occurred. Mr. Mace has satisfied his burden and Express offered no compelling proof to substantiate its arguments that the secondary employment is the primary cause of Mr. Mace's present condition.

   *2. Mr. Mace suffered from a preexisting condition (labral tear) that was aggravated by a work-related injury.*

With respect to preexisting medical conditions, the Worker's Compensation Law provides, in relevant part, that the definition of "injury" or "personal injury" shall not include "the aggravation of a preexisting disease, condition or ailment *unless it can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment.*" Tenn. Code Ann. § 50-6-102(13)(A) (2014)(emphasis added). The Tennessee Supreme Court held that:

> The employee does not suffer a compensable injury where the work activity aggravates the pre-existing condition merely by increasing the pain. However, if the work injury advances the severity of the pre-existing condition, or if, as a result of the preexisting condition, the employee suffers a new, distinct injury other than increased pain, then the work injury is compensable.

*Trosper v. Armstrong Wood Prods., Inc.,* 273 S.W.3d 598, 607 (Tenn. 2008).

The medical records indicate that Dr. Petty believes the labral tear occurred earlier than the rotator cuff tear (Ex. 1, p. 56). Dr. Petty indicated in the Medical Questionnaires that he gave

10

his answers to a reasonable degree of medical certainty. The January 28, 2015 Medical Questionnaire indicates that the bakery cart incident, "may have aggravated the labral tear too." He uses the term "may," which, admittedly, makes this a close call.

Counsel for Mr. Mace argued that the two injuries are related, and that Mr. Mace did not know he had a labral tear until the incident. He argued that, if Mr. Mace had the labral tear prior to November 4, 2014, he was nonetheless fully able to perform his job duties until the accident. Mr. Mace testified that he had no problems with his left arm and shoulder prior to the incident. A claimant's assessment of his or her physical condition is competent testimony and may not be disregarded. *Uptain Constr. Co. v. McClain,* 526 S.W.2d 458, 459 (Tenn. 1975).

Counsel for Express asserted that it cannot be liable for repair of the labral tear because Mr. Mace failed to satisfy his burden to show that the aggravation arose "primarily" out of the course and scope of employment as required by the Workers' Compensation Law  The Court asked Express' Counsel whether, if the Court should order additional medical benefits, it seems reasonable for Dr. Petty to repair the work-related rotator cuff tear, but if he determines while preforming the surgery that the torn labrum is not work-related, he should leave it for a separate procedure, covered by another entity. Express' Counsel cited *Houser v. Bi-Lo, Inc.* 36 S.W.3d 68 (Tenn. 2001) in support of the non-compensability of repair of the labral tear, focusing solely on that case's "general proposition" that workers' compensation coverage is not as broad as general health and accident insurance. *Id.* at 72. Counsel conceded, however, that *Houser* did not address the same issue as presented in the case at bar and acknowledged that this case presents "a unique situation." The Court declines to dictate what Dr. Petty should or should not repair in Mr. Mace's shoulder. Because the Court concludes further in this Order that Mr. Mace has met his burden regarding the need for surgery, it will be left to Dr. Petty's discretion regarding the best course of treatment.

### 3. Mr. Mace is entitled to additional medical care.

The Workers' Compensation Law requires an employer to furnish, "free of charge to the employee, such medical *and surgical treatment,"* as ordered by the attending physician and deemed reasonably necessary by the accident. Tenn. Code Ann. § 50-6-204(a)(1)(A) (2014) (emphasis added). "Any treatment recommended by a physician selected pursuant to this subdivision (a)(3) … shall be presumed to be medically necessary for treatment of the injured employee." Tenn. Code Ann. § 50-6-204(a)(3)(H) (2014). The statute mirrors longstanding caselaw; any care prescribed by the physician selected from the panel is presumed to be reasonable and necessary for treatment of the employee's work-related injury. *See Russell v. Genesco, Inc.,* 651 S.W.2d 206, 211 (Tenn. 1983).

In this case, Express offered no medical evidence to rebut this presumption. Accordingly, Mr. Mace is entitled to the requested medical benefit. As previously explained, the extent of the surgery remains a medical decision, not a legal one. The Court concludes that Mr. Mace has presented sufficient evidence for the Court to conclude that he would likely prevail at a hearing on the merits in accordance with the express terms of section 50-6-239(d)(1).

11

**IT IS, THEREFORE, ORDERED** as follows:

1. Additional medical care for Mr. Mace's injuries shall be allowed and Express or its workers' compensation carrier shall authorize the recommended surgery as required by Tennessee Code Annotated section 50-6-204. Mr. Mace, Dr. Petty, and/or any other approved medical providers shall furnish all medical bills to Express or its workers' compensation carrier for payment.

2. By copy of this Expedited Hearing Order, this matter is referred to the Penalty Program for review of possible penalties regarding Express' use of the utilization review process.

3. This matter is set for Initial Hearing on June 3, 2015, at 9:00 a.m. Central Time.

4. **Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven (7) business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2014). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Division by email to WCCompliance.Program@tn.gov no later than the seventh (7th) business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

5. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED this the 27th day of April, 2015.**

**Kenneth M. Switzer, Chief Judge**
**Court of Workers' Compensation Claims**

Initial Hearing:

An Initial Hearing has been set with **Chief Judge Kenneth M. Switzer, Court of Workers Compensation Claims. You must call 615-532-9552 or toll free at 866-943-0025 to participate in the Initial Hearing.**

**Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal

12

the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within seven (7) business days* of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The parties, having the responsibility of ensuring a complete record on appeal, may request from the Court Clerk the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a statement of the evidence within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. The Judge must approve the statement of the evidence before the Clerk of Court shall submit the record to the Clerk of the Appeals Board.

5. If the appellant elects to file a position statement in support of the interlocutory appeal, the appealing party shall file such position statement with the Court Clerk within three (3) business days of the filing of the Expedited Hearing Notice of Appeal, specifying the issues presented for review and including any argument in support thereof. If the appellee elects to file a response in opposition to the interlocutory appeal, appellee shall do so within three (3) business days of the filing of the appellant's position statement.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 27th day of April, 2015.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|------|------|------|------|------|------|------|
| William Hicky, Employee's attorney | | | | | X | will@hickylaw.com |
| Greg Fuller, Employer's attorney | | | | | X | gfuller@mijs.com |
| Penalty Program | | | | | X | WCCompliance.Program@tn.gov |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims

13

**APPENDIX 1**



Exhibit 13