**EXCEL POLYMERS, LLC**

v.

**Richard BROYLES.**

Supreme Court of Tennessee,
at Knoxville.

Sept. 4, 2009 Session.

Dec. 22, 2009.

Kristin M. Cabage and David A. Chapman, Knoxville, Tennessee, for the appellant, Excel Polymers, LLC.

Howell H. Sherrod, Johnson City, Tennessee, for the appellee, Richard Broyles.

## OPINION

SHARON G. LEE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined. GARY R. WADE, J., not participating.

In this workers' compensation case, the issues presented are whether the trial court erred in admitting the opinion testimony of the employee's treating physician on the issue of causation, whether the evidence preponderates against the trial court's ruling that the employee met his burden of proof that he suffered a compensable occupational disease as defined by Tennessee Code Annotated section 50–6–301, and whether the trial court erred in its disposition of the motion and suggestion of death filed by the employee's widow after the trial. We affirm the judgment of the Special Workers' Compensation Appeals Panel and of the trial court and remand to the trial court for a determination of the employee's legal dependents and the amount of death benefits, if any, due to them under the applicable workers' compensation law.

### Factual and Procedural Background

Richard Broyles worked for Excel Polymers, LLC ("Excel Polymers") for approximately twenty-nine years. For the first fifteen years of his employment, Mr. Broyles worked in Excel Polymers' shipping and receiving department, loading and unloading containers of various substances used to manufacture rubber products. He then worked for about three years in an area of the plant where materials were mixed to make rubber. Mr. Broyles worked as a traffic coordinator for the last ten years of his employment. As a traffic coordinator, Mr. Broyles spent most of his time in an office inside the plant, but he was also required to be on the floor of the plant in various areas on a regular basis. Mr. Broyles testified that over the course of his employment with Excel Polymers, and particularly during his years working in the shipping department, he was often exposed to dust from various chemicals and substances, including fine powdery silicates.

Mr. Broyles began experiencing shortness of breath in 2005. He was treated by Dr. James Hansen, a pulmonary medicine specialist, who diagnosed him with usual interstitial pneumonitis ("UIP"), a scarring of his lung tissues. Dr. Hansen testified that in his opinion Mr. Broyles' UIP was caused by exposure to silica dust at work, noting that his lung biopsy revealed "polarizable particles consistent with silica dust." Dr. Hanson classified Mr. Broyles as having a class four ("severe") impairment under the American Medical Association Guides to the Evaluation of Permanent Impairment ("AMA Guides") because of his pulmonary function test, which correlates to a 51 to 100 percent impairment of the whole person, and stated that Mr. Broyles' impairment was "closer to 100" percent than to 51 percent.

On December 19, 2005, Excel Polymers filed a petition in the Washington County Circuit Court for a determination of Mr. Broyles' rights under the Workers' Compensation Law, alleging among other things that Mr. Broyles "cannot establish a work-related occupational disease was the proximate cause of his alleged lung condition." Three days later, Mr. Broyles filed a claim for workers' compensation benefits, alleging that his UIP was a work-

related occupational disease that resulted in his injury and disability. On the date of trial, February 1, 2008, Mr. Broyles was fifty-five years old. Because he was hospitalized for his breathing condition and was too ill to testify in person at the trial, Mr. Broyles' deposition was placed into evidence.

At trial, the primary contested issue was causation. The trial court found that Mr. Broyles sustained his burden of proof that he had an occupational disease and awarded him permanent and total disability benefits. On March 28, 2008, two days after the trial court entered its judgment, Mr. Broyles died. Excel Polymers filed its notice of appeal on April 18, 2008. On April 25, 2008, Excel Polymers filed a motion with the trial court to stay the execution of the judgment pending appeal and to set an appropriate surety bond. On July 14, 2008, Mr. Broyles' widow filed a "motion/suggestion of death" with the trial court informing the court of Mr. Broyles' death, alleging that he "left a wife and one child as dependents who are entitled to be substituted for workers' compensation accruing after his death," and moving to be "substituted as an additional party pursuant to T.C.A. § 50–6–204 et seq."

Following a hearing, the trial court on July 31, 2008. entered an order (1) awarding discretionary costs to Mr. Broyles in the amount of $3,235.50; (2) staying the judgment pending appeal and setting a surety bond of $400,000; (3) stating that "the Court accepts the filing of the Suggestion of Death, subject to the ascertainment of the legal dependents which permit[s] said dependents to receive workers' compensation benefits in accordance with [the] Tennessee Workers' Compensation Act;" and (4) incorporating by reference a transcribed memorandum opinion delivered from the bench at the end of the hearing. On appeal to the Special Workers' Compensation Appeals Panel, Excel Polymers contended that the trial court erred in admitting Dr. Hansen's testimony on the issue of causation and in concluding that Mr. Broyles proved that he had an occupational disease as defined by Tennessee Code Annotated section 50–6–301 (2008). The panel affirmed the judgment of the trial court. We granted Excel Polymers' petition for full Court review.

## Analysis

### Standard of Review

Our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn.Code Ann. § 50–6–225(e)(2) (2008). " 'When the trial judge has seen and heard a witness's testimony, considerable deference must be accorded on review to the trial court's findings of credibility and the weight given to that testimony.' " *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 419 (Tenn.2009) (quoting *Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d 164, 167 (Tenn. 2002)). When the record contains expert medical testimony presented by deposition, the reviewing court may draw its own conclusions with respect to the weight and credibility afforded that documentary evidence. *Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn.2008). Our review of a trial court's conclusions of law is de novo upon the record with no presumption of correctness. *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn.2008).

### Issues

We review the following issues: (1) whether the trial court erred in admitting the testimony of the treating physician, Dr. Hansen, upon the issue of causation of Mr. Broyles' injury; (2) whether the evidence preponderates against the trial

court's conclusion that Mr. Broyles sustained his burden of proof that his injury resulted from an occupational disease, as defined by Tennessee Code Annotated section 50–6–301; and (3) whether the trial court erred in its disposition of the motion and suggestion of death filed by Mr. Broyles' widow following its award of workers' compensation benefits. As regards the first two issues, we find no error and affirm the judgment of the trial court. As regards the third issue, because the trial court made no ruling or award of benefits pertaining to Mr. Broyles' two surviving alleged dependents other than "accept[ing] the filing of the Suggestion of Death, subject to the ascertainment of the legal dependents which permit[s them] to receive workers' compensation benefits in accordance with [the] Tennessee Workers' Compensation Act," we remand the case to the trial court for a determination of the employee's legal dependents and the amount of death benefits, if any, due to them under the applicable workers' compensation law.

## Admissibility of Dr. Hansen's Expert Testimony

 Excel Polymers argues that the trial court erred in denying its motion in limine to exclude the testimony of Dr. Hansen, Mr. Broyles' treating physician, on the issue of causation of Mr. Broyles' injury. The admission of expert proof is governed by Tennessee Rules of Evidence 702 and 703. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn.2007); *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn.2005). Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an

opinion or otherwise." Tennessee Rule of Evidence 703 directs the trial court to "disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

 Issues regarding expert qualifications and the admissibility, relevancy, and competency of expert testimony are matters generally left to the trial court's discretion. *Brown*, 181 S.W.3d at 273. "We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." *Id.* We have defined a trial court's abuse of discretion as occurring "when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Scott*, 275 S.W.3d 395, 404 (Tenn.2009).

In *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn.1997), this Court set forth several nonexclusive factors a court may consider in determining the reliability of scientific testimony, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether ... the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Id.* at 265; *see also Brown*, 181 S.W.3d at 274. In *Brown*, we reemphasized the nonexclusivity of the *McDaniel* factors and cautioned that "[t]hese factors are not mandated in every case in which expert evidence is offered and should not be ap-

plied unless the factor or factors provide a reasonable measure of the expert's methodology." *Id.* at 272. The *Brown* Court also identified two other nondefinitive factors that a trial court may consider in assessing the reliability of an expert's methodology: (1) the expert's qualifications for testifying on the subject at issue, and (2) the connection between the expert's knowledge and the basis for the expert's opinion. *Id.* at 274–75.

In attacking the reliability and trustworthiness of Dr. Hansen's opinion concluding with reasonable medical certainty that Mr. Broyles' work environment, specifically his exposure to respirable silica dust particles, caused and exacerbated his UIP disease, Excel Polymers points to the following: (1) Dr. Hansen's inability to identify with complete certainty the particles revealed in the lung biopsy; (2) Dr. Hansen's lack of familiarity with the rubber manufacturing industry in general and the Excel Polymers plant in particular; (3) Dr. Hansen's lack of reliance upon the AMA Guides and the Occupational Safety & Health Administration ("OSHA") exposure guidelines; and (4) Dr. Hansen's general agreement that the medical community "predominantly" considers a diagnosis of UIP to be idiopathic (i.e., without a known cause). After reviewing Dr. Hansen's testimony, we agree with the trial court and the special panel that Excel Polymers' criticisms of his opinions are more pertinent to the weight of his testimony, rather than its admissibility.

At the time of trial, Dr. Hansen had been a board-certified specialist in pulmonary medicine for fifteen years and was Mr. Broyles' treating physician from the time of the onset of his respiratory illness. Among other things, Dr. Hansen based his diagnosis and conclusions regarding causation upon Mr. Broyles' description of his work history, his exposure to respirable dust particles and upon the lung biopsy that revealed the presence of particles consistent with silica dust of a size so small that it exists only in occupational and industrial settings. This Court observed in *Brown* that the trial court "should distinguish between the marginally-qualified full-time expert witness who is testifying about a methodology that she has not employed in real life and the highly credentialed expert who has devoted her life's work to the actual exercise of the methodology upon which her testimony is based." *Brown*, 181 S.W.3d at 274 (internal quotation marks and citation omitted). Dr. Hansen clearly falls into the latter category. He testified that this case was the first time he had been called upon to provide an expert opinion.

Excel Polymers argues that there is no support in the medical literature for the opinion that exposure to silica dust causes UIP and that UIP is known only to the medical community as a disease that has no identifiable cause. Dr. Hansen testified consistently and repeatedly that the medical community classifies UIP as idiopathic "predominantly, but not entirely. I have a paragraph from a pulmonary text that says that if you'd like to see it." Dr. Hansen referred to an article on cross-examination entitled "An Elemental Analysis of Inorganic Dust in Lung Tissues of Interstitial Pneumonias," stating that it recognized that "there can be cases of UIP with silica exposure, inorganic dust exposure" and "linking UIP with inorganic dust."

Having carefully reviewed Dr. Hansen's testimony, we are satisfied that the trial court did not abuse its discretion in holding the testimony admissible under Tennessee Rules of Evidence 702 and 703. Nothing in Dr. Hansen's scientific methodology or medical qualifications raises the concern that his opinions are so objectiona-

ble as to require their exclusion. As the special panel observed, Dr. Hansen was able to plausibly articulate and explain the reasoning supporting his opinions regarding causation of Mr. Broyles' lung disease. Excel Polymers' other objections regarding Dr. Hansen's familiarity with its industry and plant, and his consideration of the AMA and OSHA guidelines, pertain more to the weight of his testimony than its admissibility. The judgment of the panel and trial court on this issue is affirmed.

### Proof of Occupational Disease

■ Excel Polymers argues that the trial court erred in holding that Mr. Broyles met his statutory burden of proof to demonstrate that he suffered from a compensable occupational disease, contending that (1) there is little or no evidence supporting Dr. Hansen's theory that UIP can be caused by exposure to respirable dust in the workplace; and (2) if Dr. Hansen's theory has validity, the evidence in the record preponderates against the trial court's finding that Mr. Broyles' disease was caused by such dust exposure in the course of his employment with Excel Polymers.

The Tennessee Legislature has established the following six elements that must be satisfied to sustain a workers' compensation occupational disease claim:

As used in this chapter, "occupational diseases" means all diseases arising out of and in the course of employment. A disease shall be deemed to arise out of the employment only if:

(1) It can be determined to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

(2) It can be fairly traced to the employment as a proximate cause;

(3) It has not originated from a hazard to which workers would have been equally exposed outside of the employment;

(4) It is incidental to the character of the employment and not independent of the relation of employer and employee;

(5) It originated from a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected prior to its contraction; and

(6) There is a direct causal connection between the conditions under which the work is performed and the occupational disease. Diseases of the heart, lung, and hypertension arising out of and in the course of any type of employment shall be deemed to be occupational diseases.

Tenn.Code Ann. § 50–6–301.

■ Generally speaking, a workers' compensation claimant must establish by expert medical evidence the causal relationship between the alleged injury and the claimant's employment activity, " '[e]xcept in the most obvious, simple and routine cases.' " *Cloyd v. Hartco Flooring Co.,* 274 S.W.3d 638, 643 (Tenn.2008) (quoting *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn.1991)). The claimant must establish causation by the preponderance of the expert medical testimony, as supplemented by the evidence of lay witnesses. *Id.* As we observed in *Cloyd,* the claimant is granted the benefit of all reasonable doubts regarding causation of his or her injury:

"Although causation in a workers' compensation case cannot be based upon speculative or conjectural proof, absolute certainty is not required because medical proof can rarely be certain...." *Clark v. Nashville Mach. Elevator Co.,* 129 S.W.3d 42, 47 (Tenn.2004); *see also Glisson v. Mohon Int'l, Inc./Campbell Ray,* 185 S.W.3d 348, 354 (Tenn.2006).

All reasonable doubts as to the causation of an injury and whether the injury arose out of the employment should be resolved in favor of the employee. *Phillips v. A & H Constr. Co.*, 134 S.W.3d 145, 150 (Tenn.2004).

*Id.; see also Fritts v. Safety Nat'l Cas. Corp.*, 163 S.W.3d 673, 678 (Tenn.2005). The trial court may properly award benefits based upon medical testimony that the employment "could or might have been the cause" of the employee's injury when there is also lay testimony supporting a reasonable inference of causation. *Fritts*, 163 S.W.3d at 678.

All of the medical experts that testified in this case concurred in Dr. Hansen's diagnosis of UIP, a scarring of the lungs in a certain pattern revealed in Mr. Broyles' case by x-rays, CT scans, and a lung tissue biopsy. As noted, Dr. Hansen opined that Mr. Broyles' UIP was caused by his exposure to respirable dust particles in the workplace, explaining his opinion as follows:

> Q: Just because it results in a UIP pattern does that—what does that mean? Does that mean you don't know the cause?
>
> A: No, it doesn't. Now, that's just the typical pattern. Like I mentioned, you see the fibrotic changes mainly in the bottom parts of the lungs more towards the periphery of the lungs. That would be the typical UIP pattern, whereas a silicosis pattern is more nodular typically more in the upper lung fields.
>
> Q: Well, can or cannot whatever dust that you believe Mr. Broyles was exposed to at work, could that cause his pulmonary fibrosis?
>
> A: I believe it can.
>
> Q: Do you believe it did?
>
> A: Yes.

> Q: Do you believe that with reasonable certainty in your profession?
>
> A: Yes.
>
> . . .
>
> THE COURT: I'm looking at the Vanderbilt Pathology Report. What it says is polarization reveals a moderate number of polarizable particles consistent with silica dust.
>
> A: Uh-huh.
>
> THE COURT: Do you know within a reasonable degree of medical certainty whether what's in Mr. Broyles' lungs is silica dust or could it be something else?
>
> A: It could be something else. You know, it's an inorganic dust of some type. Is it talc? Is it silica? Those would be the two most common types.
>
> THE COURT: Well, okay. In reading your deposition, is it your opinion that that kind of dust is not found naturally in the environment?
>
> A: Not in the particle size to get in the lungs. . . . It's found in the environment but not in that particle size.
>
> . . .
>
> Q: Are you aware from Mr. Broyles' history of any other place or location or employment that he could have been exposed to the size particles that were found in his lungs?
>
> A: No.

Dr. Hansen testified that none of the questions he was asked on cross-examination shook his belief that Mr. Broyles' work environment caused and advanced his pulmonary fibrosis disease; when asked to explain why, Dr. Hansen stated:

> It really boils down to simple facts. He has the occupational exposure that he himself has described. He has inorganic dust in the lungs that's proven by a biopsy. Like I said, it's only found in occupational exposures. That's the only place he was working at the time. It's

all consistent. And finding inorganic dust particles in the lungs like we've mentioned is rare, and the disease itself is rare. And for those two to occur together independent of a causative factor, would be very, very unlikely.

Excel Polymers presented the in-court testimony of Dr. Marilyn Bishop, an occupational medicine specialist who conducted an independent medical examination of Mr. Broyles and reviewed his medical records and medical literature pertinent to the issues in this case. Dr. Bishop testified that she was also familiar with the substances and chemicals used in the Excel Polymers plant, which she had visited and inspected on previous occasions. Dr. Bishop opined that UIP is an idiopathic disease, that there is no scientifically documented relationship between UIP and occupational or environmental exposures, and that she believed there was no causal link between Mr. Broyles' exposure to dust in the workplace and his disease.

Excel Polymers also presented the deposition testimony of Dr. Arnold Hudson, a pulmonary medicine specialist. Dr. Hudson did not examine Mr. Broyles but reviewed his medical records. He stated that "about all we know [about UIP] is that there's a continual ongoing inflammatory reaction and there's certainly the possibility that there's something in the environment that initiates this, perhaps even causes it to continue," but also said that within a reasonable degree of medical certainty, the cause of UIP is unknown. Dr. Hudson testified that there were three known "associations" of classes of people more likely to contract UIP: males, persons aged 50 to 70, and smokers; Mr. Broyles was in all three "associated" categories. However, Dr. Hudson also testified that UIP "is not something that seems to be caused by smoking." Dr. Hudson admitted that he did not know how much silica dust Mr. Broyles was exposed to in his work environment and stated that Mr. Broyles "should not return to basically any industrial environment where there's going to be, you know, uncontrolled temperature, humidity, dust, fumes, etc." Asked whether there was a causal connection between Mr. Broyles' workplace and his UIP disease, Dr. Hudson answered, "you know, if you ask me could there be, I'd have to say yes, but within a reasonable degree of medical certainty, I would say no."

Mr. Broyles testified about his exposure to respirable dust at the Excel Polymers plant over the years of his employment there. He stated that while he was engaged in loading and unloading bags, they would often break, releasing a fine powdery dust into the air. Mr. Broyles testified that the bags that broke often contained a product called HiSil, a powdery form of silica. In short, Mr. Broyles testified that he was exposed to a large amount of respirable dust during his approximately twenty-nine years working at the Excel Polymers plant.

Ron Read, the environmental manager for Excel Polymers and a certified industrial hygienist and pharmacist, testified at the trial. Mr. Read introduced records of air quality testing performed at the plant. Most of the records of the air testing done for crystalline silica (a hazardous breathable form of silica) showed a "below detectable" or acceptable level. At least one test revealed an amount of crystalline silica above the Tennessee Occupational Safety and Health Administration's permissible exposure limit ("PEL"), and another showed a level very close to the PEL. Moreover, Excel Polymers stipulated that it did not test the air in the plant for crystalline silica prior to 1997; and Mr. Read admitted that no air testing was done at all from 1976 to 1985, and that no records of testing existed for the years 1989, 1990, 1991, 1993, and 1994.

Dr. Hansen testified to the effect that Mr. Broyles' exposure during these earlier years when there was no air testing could be very significant to the question of causation, stating that

> I would like to say also that there is a long latency period in—from exposure to disease in this particular type of case. You can have an exposure and see disease fifteen to twenty years later, so the testing would have to be something that would involve [Mr. Broyles'] entire work history to be accurate and reflect what really he was exposed to.

Based on our review of the evidence, including the testimony outlined above, we do not find that it preponderates against the trial court's conclusion that Mr. Broyles met his burden of proving that he suffered from an occupational disease as defined by Tennessee Code Annotated section 50–6–301. The trial court saw and heard Drs. Hansen and Bishop testify in person and thus had the opportunity to assess their credibility and demeanor. The trial court clearly credited Dr. Hansen's credibility on the question of causation, and we are unable to say it erred in so doing. Further, we have observed that "[i]t seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman,* 803 S.W.2d at 677. Dr. Hansen, as the treating physician since the onset of Mr. Broyles' disease, had this greater contact with the claimant. The judgment of the trial court awarding Mr. Broyles permanent and total disability benefits as a result of his occupational disease is affirmed.

### Mr. Broyles' Surviving Legal Dependents

■ As noted, Mr. Broyles died two days after the trial court entered its order awarding him workers' compensation benefits. Several months later, his widow filed a "motion/suggestion of death" with the trial court, informing the court of his death, alleging that he "left a wife and one child as dependents who are entitled to be substituted for workers' compensation accruing after his death," and moving to be "substituted as an additional party pursuant to T.C.A. § 50–6–204 *et seq.*" Excel Polymers argues that the effect of the trial court's order "accepting the filing of the Suggestion of Death" was to hold "that the permanent and total disability benefits awarded to the Employee simply 'carried over' to the Employee's dependents once their identity was ascertained." If this characterization of the trial court's ruling were accurate, Excel Polymers would probably be correct in its assertion of error, because it has long been the law in Tennessee that "[w]ages cease with death, and likewise compensation received in lieu of wages must cease with death." *Bry–Block Mercantile Co. v. Carson,* 154 Tenn. 273, 288 S.W. 726, 728 (1926); *accord Warrick v. Cheatham County Highway Dep't,* 60 S.W.3d 815, 818–19 (Tenn.2001); *Rose v. City of Bristol,* 203 Tenn. 629, 315 S.W.2d 237, 238 (1958): *Marshall v. S. Pittsburg Lumber & Coal Co.,* 164 Tenn. 267, 47 S.W.2d 553, 554 (1932). As we observed in *Warrick,* "a worker's personal representative may recover benefits on behalf of the deceased employee from the time of injury to the time of death[.]" *Warrick,* 60 S.W.3d at 820. Therefore, Excel Polymers' obligation to Mr. Broyles for disability benefits ended at the time of his death.

■ Excel Polymers' potential liability for death benefits is a separate issue governed by different statutory authority. Statutes which provide guidance

include Tennessee Code Annotated sections 50–6–207(5) (Deductions in the case of death); 50–6–209 (Maximum compensation); 50–6–204(c) (Burial expense); 50–6–210 (Dependents—Compensation Payments); 50–6–226(a)(3)(Attorney Fees); 50–6–221 (Receipts for payments); and 50–6–227 (Alien Dependents). Better practice dictates the filing of a separate proceeding where issues relating to causation of death, identity and classification of legal dependents, burial expenses and other such issues may be litigated. In this case, a separate proceeding was not filed. The death of Mr. Broyles was brought to the attention of the trial court by way of a motion/suggestion of death. The trial court, however, did not make an award of benefits to Mr. Broyles' legal dependents, nor did it adjudicate who his dependents were. The trial court stated in its order only that "the Court accepts the filing of the Suggestion of Death, subject to the ascertainment of the legal dependents which permit said dependents to receive workers' compensation benefits in accordance with [the] Tennessee Workers' Compensation Act." Although the trial court incorporated by reference its oral memorandum opinion delivered from the bench at the end of the hearing on the matter, the transcript discloses no adjudication of legal dependents or further award of workers' compensation benefits.

This Court was presented with a situation similar in some regards upon this issue in *Oman Constr. Co. v. Bray*, 583 S.W.2d 303, 305 (Tenn.1979), wherein we stated that "[s]ince the jurisdiction of this Court is appellate only, the petition ... seeking to recover as dependents under the workmen's compensation law for the death of [the claimant] is hereby remanded to the trial court for a trial in that court upon the merits." Likewise, we find it appropriate to remand to the trial court for hearing, pursuant to the applicable statutes regarding death benefits, all issues regarding benefits, if any, due as a result of the death of Mr. Broyles.

### Conclusion

The judgment of the Special Workers' Compensation Appeals Panel affirming the trial court's judgment is affirmed. The case is remanded to the Washington County Circuit Court for a determination of all issues regarding benefits, if any, due as a result of the death of Mr. Broyles under the applicable workers' compensation law. Costs on appeal are assessed to the Appellant, Excel Polymers, LLC.

GARY R. WADE, J., not participating.