

**FILED**

**May 25, 2016**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 1:40 PM**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT NASHVILLE

| | | |
|---|---|---|
| **SHANE SMILEY,** | ) | |
| **Employee,** | ) | **Docket No. 2016-06-0104** |
| **v.** | ) | **State File No. 2435-2016** |
| **FOUR SEASONS COACH LEASING** | ) | |
| **and LIVE SOUL TOURING,** | ) | **Docket No. 2016-06-0105** |
| | ) | **State File No. 6196-2016** |
| **Employers,** | ) | |
| **and** | ) | **Judge Joshua Davis Baker** |
| **ACCIDENT FUND INSURANCE** | ) | |
| **and FIREMANS FUND,** | ) | |
| **Carriers.** | ) | |

## EXPEDITED HEARING ORDER
## FOR MEDICAL AND TEMPORARY DISABILITY BENEFITS

This matter came before the Court on May 5, 2016, upon the Request for Expedited Hearing filed by the employee, Shane Smiley, pursuant to Tennessee Code Annotated section 50-6-239 (2015). Mr. Smiley alleged back and shoulder injuries, which arose primarily out of and in the course and scope of his employment as a tour bus driver. The present focus of this case is Mr. Smiley's entitlement to additional medical treatment and temporary disability benefits. The central legal question is whether Mr. Smiley was an employee or an independent contractor at the time of the incident. If the Court determines he was an employee, the Court must decide whether Mr. Smiley worked for Four Seasons Coach Leasing or Live Soul Touring and then determine whether his injury arose primarily out of and in the course and scope of his employment. For the reasons set forth below, the Court finds Mr. Smiley will likely succeed at a hearing on the merits in proving he suffered an injury arising primarily out of and in the course and scope of his employment with Four Seasons and in proving entitlement to medical treatment and temporary disability benefits.[1]

---

[1] A complete listing of exhibits and the technical record admitted at the Expedited Hearing is attached to this Order as an appendix.

## History of Claim

Mr. Smiley is a forty-nine-year-old resident of Davidson County, Tennessee, who worked as a tour bus operator. In this case, Mr. Smiley drove the tour bus rented by Live Soul from Four Seasons. The bus rental agreement between Live Soul and Four Seasons provided Four Seasons would be responsible for paying the bus driver. Four Seasons and Live Soul, however, executed an addendum to the contract agreeing Live Soul would pay Mr. Smiley directly. (Ex. 7.) Although he was not pleased with the decision, Mr. Smiley accepted the arrangement, agreed to drive the tour bus and executed a 1099 tax form.

The tour began on November 28, 2015. That day, Mr. Smiley left from Lebanon, Tennessee, enroute to Philadelphia, Pennsylvania, to meet the members of the Live Soul touring party headlined by musician Jill Scott. The tour bus left Philadelphia on November 30, 2015, to begin the nineteen-day tour.

Mr. Smiley drove a bus a called "Widnes 15" on the Live Soul tour. He previously drove the same bus during a tour with singer Pat Benatar. According to his affidavit, following the conclusion of the Pat Bentar tour, he told the Four Seasons maintenance department that "the seat was pretty uncomfortable and made me sore." He explained:

> The seat has bolsters that made me sit funny. I attempted to improve the fit both with a separate pad and a sheepskin seat cover. The pad gave no relief and the seat cover helped a little. I believe the cover served as a cradle of sorts. Relieving pressure on my hips.

(Ex. 2.) Fortunately, the soreness resolved several days after completion of the Pat Benatar tour.

While driving the Widnes 15 for Live Soul, Mr. Smiley again began experiencing pain in his hips accompanied by neck and shoulder tension. He initially combatted the soreness through stretching and taking hot showers. According to his affidavit, however, the condition of his back deteriorated over the course of the tour. After completing a 512-mile trip from Boston, Massachusetts to Washington D.C. in windy and icy weather conditions, his back was tight and sore. He testified:

> We got bounced around pretty good . . . We had a lot of cross winds, ah rain, freezing rain, a lot of debris it being like fall, early winter, being flung through the air, ah some spots of black ice. And in the northeast there is a great deal of bad highway. Their best highways in the northeast are worse

than what we have in anything . . . in this region at all. There's some sections that are washboard no matter what you do . . .

In the course of that trip, in the higher winds and the weather you tend to tense up a little bit more. You do everything you can to stay relaxed but when you get tense, you get sore.

After arriving in Washington D.C., Mr. Smiley "took his normal steps" to heal his body. He had the day off on December 3, 2015, and testified he felt "pretty good." On December 4, 2015, however, when he returned to his seat on the bus, he experienced "a sharp pain in my shoulder, and in my lower back and the left hip." Mr. Smiley drove the bus from Washington D.C. to Atlanta, Georgia. When he arrived in Atlanta, he was in severe pain.

Mr. Smiley had a two-day layover in Atlanta. During the time off, he received a massage and testified he felt better. The pain, however, returned when he sat back down in the bus seat and worsened over the course of the trip. Thereafter, the pain would wax and wane until, "it became acute again" during travel between Charlotte, North Carolina, and Louisville, Kentucky.

Although his back condition was painful, Mr. Smiley testified he did not believe the condition endangered any of the passengers so he continued driving the bus. He also stated the following concerning quitting a driving job mid-tour:

There are two ways you come off the road in this industry, and its either you're on your death bed or there's a death in the family. Other than that you're basically expected to stay put unless you feel that you are in a situation that's causing a safety issue for everyone else.

The tour ended on December 15, 2015. After completing the tour, Mr. Smiley returned the bus to Four Seasons, completed his "end-of-tour work," and let Four Seasons know of his displeasure with the seat. He advised Four Seasons of the condition of his back. However, he suggested waiting until the beginning of 2016 to see if his condition improved with rest.

Mr. Smiley testified his range of motion improved but the pain in his shoulder did not. He could not sleep comfortably or sit for more than forty-five minutes at a time. He contacted Four Seasons, which informed him they carried workers' compensation for their drivers. Four Seasons submitted paperwork and provided him a panel the same day. Mr. Smiley chose Dr. Adhi Jayaraman of U.S. Healthworks and saw him the following day. (Ex. 1 at 5.)

3

Dr. Jayaraman diagnosed Mr. Smiley with neck and lumbar spine ligament sprains and disorders of the brachial plexus and intervertebral discs. He recommended x-rays, an MRI and physical therapy, and issued work restrictions that prohibited Mr. Smiley from "commercial driving." *Id.* at 6-14.

After his visit with Dr. Jayaraman, an insurance adjuster interviewed Mr. Smiley. *See* Ex. 8. Following the interview, the adjuster determined Four Seasons was not responsible for providing medical care for Mr. Smiley's injury and ended medical benefits. The adjuster opined Live Soul should be responsible for providing benefits. Mr. Smiley contacted Live Soul, who also denied responsibility for his injury. Mr. Smiley did not receive the treatment recommended by Dr. Jayaraman.

Mr. Smiley treated with Dr. Kevin Snead, a chiropractor, who operated Airport Wellness Center. Mr. Smiley explained he had a longstanding relationship with Dr. Snead, who had conducted Mr. Smiley's annual Department of Transportation fitness for duty physical since 2006. In a letter dated March 4, 2016, Dr. Snead stated Mr. Smiley had no history of back problems prior to the work-related incident.

On March 15, 2016, Mr. Smiley filed two Petitions for Benefit Determination, one naming Four Seasons as the employer and the other naming Live Soul as the employer. (T.R. 1, 2.) The parties did not settle the dispute through mediation and the mediator filed Dispute Certification Notices for both claims. (T.R. 3, 4.) Mr. Smiley then filed two Requests for Expedited Hearing. (T.R. 5, 6.)

At the expedited hearing, Mr. Smiley testified his primary responsibility is for the safety and welfare of the client and the bus, and "to get them from point A to point B." In addition to his primary responsibility, Mr. Smiley was also responsible for performing general maintenance on the bus—tire rotation, oil changes, service, etc.—for the entirety of the tour. Performing these duties in a manner that avoided service disruption yet ensured effective maintenance required Mr. Smiley to coordinate completion of the maintenance duties with the tour bus lessee and Four Seasons.

So far as securing work, Mr. Smiley testified Four Seasons called him and offered him an opportunity to drive a bus for a tour. Mr. Smiley had the option of either taking or declining the offer. However, when he accepted a job, he could not stop in the middle. He explained "when you go on the road, you are all-in. You are at their beck and call, twenty-four-seven, for the duration of the tour; whether it be twenty days or twenty weeks."

Four Seasons arranged the job for Mr. Smiley and provided the bus. Mr. Smiley testified Four Seasons maintained a list of drivers approved to drive their buses. In order to get on the approved driver list, Mr. Smiley had to undergo a screening process. He

further testified Four Seasons provided workers' compensation insurance coverage for its tour bus operators.

Mr. Smiley testified that during the tour, Live Soul directed his day-to-day activities. The tour coordinator essentially told him where to be and when to be there. He further testified that a Live Soul representative could go as far as to tell him the speed at which to operate the bus. Live Soul paid for the gas, cleaning fees, oil changes, etc. but made those payments to Four Seasons.

Mr. Smiley testified that Live Soul paid Mr. Smiley directly for his work on the tour and he completed a 1099 form before the tour began. He further stated, however, that the arrangement was somewhat atypical. In most cases, the touring company paid Four Seasons for his services and Four Seasons issued him a paycheck.

Mr. Smiley argued he was an employee and should receive workers' compensation benefits for his injury. He requested the Court award him temporary disability and medical benefits.

Both Four Seasons and Live Soul argued Mr. Smiley was an independent contractor rather than an employee. Both pointed to his right to accept or decline work offers and to accept outside employment without penalty. They also pointed to Mr. Smiley's own statements in his post-injury phone interview where he stated he was an independent contractor. In case the Court determines Mr. Smiley was an employee, Four Seasons and Live Soul both maintain Mr. Smiley was not their employee. Additionally, Four Seasons pointed to the loaned employee doctrine as imputing liability to Live Soul.

### Findings of Fact and Conclusions of Law

The following general principles govern adjudication of this proceeding. Mr. Smiley has the burden of proof on all essential elements of his workers' compensation claim. *Tindall v. Waring Park Ass'n,* 725 S.W.2d 935, 937 (Tenn. 1987); *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). Mr. Smiley need not prove every element of his claim by a preponderance of the evidence in order to obtain relief at an expedited hearing. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). At an expedited hearing, Mr. Smiley has the burden to come forward with sufficient evidence from which the trial court can determine that he is likely to prevail at a hearing on the merits. *See* Tenn. Code Ann. § 50-6-239(d)(1) (2015).

Mr. Smiley's claim implicates several distinct legal determinations including his status as an employee or independent contractor, the compensability of his accident, and

his entitlement to temporary disability and/or medical benefits. In order to succeed in his claim, Mr. Smiley must satisfy the burden described above for each legal determination. For the reasons provided below, the Court finds Mr. Smiley satisfied his burden of proof proving entitlement to medical benefits. His claim for temporary disability benefits must fail at this time for lack of an opinion on medical causation.

## I. Mr. Smiley is an employee of Four Seasons Coach

Tennessee law provides the following concerning the determination of whether an individual is an employee or an independent contractor:

> In a work relationship, in order to determine whether an individual is an "employee," or whether an individual is a "subcontractor" or an "independent contractor," the following factors shall be considered:
>
> > (i) The right to control the conduct of the work;
> > (ii) The right of termination;
> > (iii) The method of payment;
> > (iv) The freedom to select and hire helpers;
> > (v) The furnishing of tools and equipment;
> > (vi) Self-scheduling of working hours; and
> > (vii) The freedom to offer services to other entities[.]

Tenn. Code Ann. § 50-6-102(11)(D) (2015). Whether an injured worker is an employee or independent contractor depends upon the nature of the business of the alleged employer, the way the business is conducted, and the injured worker's relationship to that business. *See Seals v. Zollo*, 327 S.W.2d 41 (Tenn. 1959). While no single factor is determinative when deciding whether a worker is an employee or an independent contractor, the Supreme Court has "repeatedly emphasized the importance of the right to control the work when distinguishing employees and independent contractors, the relevant inquiry being whether the right existed, not whether it was exercised." *See Galloway v. Memphis Drum Serv.*, 822 S.W.2d 854, 856 (Tenn. 1991); *see also Kevin Jewell v. Cobble Const., et al.*, No. 2014-05-0003, 2015 TN Wrk Comp. App. Bd. LEXIS 1 (Tenn. Workers' Comp. App. Bd. Jan. 12, 2015).

Before investigating the statutory guidelines, it is important to establish the focus of Mr. Smiley's job. Although Live Soul touring told Mr. Smiley where to drive the bus and had some discretion to instruct his manner of driving, his main job was to drive and maintain the tour bus. Accordingly, in this Court's opinion, these job duties primarily affected his relationship with Four Seasons and his status as an approved driver.

Concerning the right to control the conduct of the work, the Court finds this factor tends to show Mr. Smiley worked for Four Seasons. Although he operated the bus without direct supervision, his other expected duties, particularly bus maintenance, were controlled by Four Seasons, which required him to complete those duties at specific times. Aside from the actual driving, care and maintenance of the bus were his main jobs. The manner in which he drove was ultimately governed by state law so his actions there have little bearing on the analysis. The care and maintenance, however, were performed in accordance with rules established by Four Seasons. Because Four Seasons governed his completion of these activities, the Court finds Four Seasons controlled the conduct of the work.

The right of termination also shows Mr. Smiley was an employee of Four Seasons. While Four Seasons could not force Mr. Smiley to take any job, it could certainly remove him from the approved driver list. In this Court's opinion, Four Seasons' authority to remove him from the list and provide no future work correlates with the ability to terminate an employee within the context of the tour bus operation industry.

Regarding Mr. Smiley's ability to take on other work, the Court finds this factor implicates little concerning an employer/employee relationship in the tour bus industry. Although Mr. Smiley could take on other work, he primarily drove for Four Seasons. Furthermore, once he began a job, he could not quit the job before its completion. Additionally, if he needed to leave a job for emergency reasons, only another driver approved by Four Seasons could take over operation of the bus. Accordingly, Mr. Smiley could not hire his own helpers, as his only job was to drive and maintain the bus.

There is no dispute that Four Seasons provided the equipment to complete the work. Although gas, oil and tires were required, the bus was the main equipment. It belonged to Four Seasons and Mr. Smiley essentially came with the bus when Live Soul rented it.

The right to schedule hours also shows Mr. Smiley was an employee of Four Seasons. Although the hourly operation instructions came from Live Soul, the Court finds the scheduling in this case concerned the days worked rather than hourly work. In that context, Four Seasons had complete control after Mr. Smiley accepted the job. The tour was set to run for nineteen days and Mr. Smiley had to be there each day.

Finally, in the opinion of this Court, the fact that Mr. Smiley stated he was an independent contractor on several occasions does little to support Live Soul's and Four Season's position that he worked as an independent contractor. Mr. Smiley testified he lacked a true understanding of the legal meaning of the term. Accordingly, his uneducated lay comment on the employment arrangement does not qualify as compelling proof of an independent contractor arrangement. *See Jason Thompsen v. Concrete*

*Solutions*, No. 2014-04-0012, 2015 TN Wrk. Comp. App. Bd. LEXIS 3 (Tenn. Workers' Comp. App. Bd., Feb. 10, 2015) (citing *Barber v. Purina*, 825 S.W.2d 96, 100 (Tenn. Ct. App. 1992) ("the issue of whether one is an employee or an independent contractor is one of law").

In considering all the factors, this Court determines Mr. Smiley worked as an employee of Four Seasons. Four Seasons provided the equipment and controlled the conduct of the work. When Four Seasons provided a bus, Mr. Smiley, as its approved driver, came with it. The two, the bus and the driver, are inseparable in the context of this industry. For that reason, it is also nonconsequential that Live Soul paid Mr. Smiley directly. Live Soul had to pay a fee to have a bus driver and could not choose any driver not on the approved list. Accordingly, the Court finds no employment contract existed between Live Soul and Mr. Smiley. Essentially, he was just part of the rental agreement.

For many of these same reasons, the Court finds Mr. Smiley was not a "loaned" or "borrowed" employee as argued by Four Seasons. Whether an employee qualifies as a loaned employee depends upon establishment of the following: (a) that a written or implied contract for hire between the special employer[2] and the employee existed; (b) that the work performed by the employee is essentially that of the special employer; and (c) that the special employer has the right to control the details of the work. *See Winchester v. Seay*, 409 S.W.2d 378, 381 (1966).

Here, the Court finds no contract for hire existed. Although Live Soul paid Mr. Smiley directly, the bus leasing agreement between Four Seasons and Live Soul made clear that the bus came with a driver and required Live Soul to pay the driver's compensation. Furthermore, as previously stated, Four Seasons directed care and maintenance of the bus, which was Mr. Smiley's main duty other than day-to-day driving. Accordingly, the Court finds the work Mr. Smiley performed was essentially that of Four Seasons. As the Court stated before, you cannot lease a bus without someone to drive it. Additionally, Four Seasons controlled the most significant details of the work: bus care and maintenance. Mr. Smiley's remaining duties were, in this Court's opinion, not significant in determining control of the work.

## II. Mr. Smiley suffered a work-related injury.

As set forth previously in this order, to recover benefits, Mr. Smiley must also prove he suffered an "injury" as that term is defined by the Workers' Compensation Law: "Injury means an injury by accident . . . arising primarily out of and in the course and

---

[2] Live Soul is the potential special employer.

scope of employment." Tenn. Code Ann. § 50-6-102(14) (2015).  In order to be compensable as an injury by accident, the injury must be "caused by a specific incident, or set of incidents, arising primarily out of an in the course and scope of employment, and is identifiable by time and place of occurrence[.]" *Id*. at § 50-6-102(14)(A).  "An injury 'arises primarily out of and in the course and scope of employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty-percent (50%) in causing the injury, considering all causes." *Id*. at § 50-6-102(14)(B).

> [I]n evaluating whether an injured worker's accident arose out of employment, the critical question is not whether a third party's fault or negligence "caused" the injury as that term is applied in a tort setting, but whether the employment more likely than not caused the accident in the sense that the accident had its origin in hazards to which the employee was exposed by reason of the employment.

*Laury Navyac v. Universal Health Serv's*, No. 2015-06-0677, TN Wrk Comp. App. Bd. 2016 LEXIS 17, at *16 (Tenn. Workers' Comp. App. Bd. Mar. 31, 2016).

In addition to factual circumstances demonstrating injury, medical causation also must be proven.  Except in "the most obvious, simple and routine cases," an injured employee must establish by expert medical testimony that he or she is injured and that there exists a causal relationship between the injury and the claimant's employment activity.  *Wheetley v. State*, No. M2013-01707-WC-R3-WC, 2014 Tenn. LEXIS 476 (Tenn. Workers' Comp. Panel June 25, 2014) (citing *Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 274 (Tenn. 2009); *Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 638, 643 (Tenn. 2008)).  The cause of this injury must be shown to a reasonable degree of medical certainty, meaning "in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." Tenn. Code Ann. § 50-6-102(13)(D). Evidence of medical causation is not, however, required to recover medical benefits in the context of an expedited hearing.  *See Lewis v. Molly Maid*, No. 2015-06-0456 TN Wrk Comp. App. Bd. 2016 LEXIS 19 (Tenn. Workers' Comp. App. Bd. Apr. 20, 2016).

In this Court's opinion, Mr. Smiley's description of the hazards encountered while driving the tour bus over the period from November 28 through December 15, 2015, satisfies his burden of proving his condition arose from an incident or specific set of incidents, identifiable by time and place of occurrence.  *See* Tenn. Code Ann. § 50-6-102(14)(A) (2015).  Dr. Snead's letter stated Mr. Smiley had no back problems prior to the accident.  Mr. Smiley credibly testified he began suffering pain and soreness in his back when he first drove the bus from Tennessee to Pennsylvania on November 28, 2015. Over the course of the tour, Mr. Smiley drove the bus through harsh conditions and over rough roads.  The trip from Boston, Massachusetts, to Washington D.C. on December 2,

2015, was particularly harrowing. Each jar, pull, and push on the bus contributed to his condition until his pain finally became almost unbearable. Although Mr. Smiley identified no particular bump in the road, gust of wind, or patch of ice that solely caused his condition, the prolonged exposure to this stimulus coupled with the poor condition of the seat is specific enough under these circumstances to demonstrate a likelihood of success on the merits at trial concerning the occurrence of an injury by accident.

The Court further finds these incidents arose primarily out of and in the course and scope of his employment as a driver for Four Seasons. It cannot be disputed that Mr. Smiley would not have been in the malformed bus seat and exposed to the harsh road and weather conditions but for his employment as a driver for Four Seasons. *See Navyac*, 2016 TN Wrk Comp. App. Bd. 2016 LEXIS 17 at *16. Additionally, neither Four Seasons nor Live Soul provided an alternative explanation for his back condition. The Court, therefore, finds Mr. Smiley would likely prevail at a hearing on the merits in proving the injury-causing incidents arose primarily in the course and scope of his employment for Four Seasons.

Lastly, with respect to the factual basis of Mr. Smiley's claim, the Court finds Mr. Smiley has not proven a likelihood of success on the merits in proving medical causation of his back condition as neither Dr. Jayaraman nor Dr. Snead opined on medical causation. *See Wheetly*, 2014 Tenn. LEXIS 476. However, the lack of a causation opinion does not impact his entitlement to medical benefits. *See Lewis*, 2016 TN Wrk Comp. App. Bd. LEXIS 19.

**II.     Mr. Smiley is entitled to medical benefits but not temporary disability benefits.**

Mr. Smiley seeks medical care for his work-related injury. Having carried his burden of proving he would likely succeed at a hearing on the merits in proving compensability of his injury, Four Seasons must provide him reasonable and necessary medical care for its treatment. *See* Tenn. Code Ann. § 50-6-204(a)(l)(A) (2015). Upon being provided notice of a workplace injury, the Workers' Compensation Law requires an employer to "designate a group of three (3) or more independent reputable physicians, surgeons, chiropractors or specialty practice groups if available in the injured employee's community or, if not so available, in accordance with subdivision (a)(3)(B), from which the injured employee shall select one (1) to be the treating physician." *Id.* at 50-6-204(a)(3)(A)(i). Any care recommended by a physician chosen from the panel is presumed to be reasonable and necessary for treatment of the work-related injury. Tenn. Code Ann. § 50-6-204(a)(3)(H) (2015).

Mr. Smiley seeks additional medical treatment, specifically the x-rays, MRI, and physical therapy recommended by Dr. Jayaraman. Dr. Jayaraman is the authorized

10

treating physician so his recommendation for these tests and treatment is presumptively reasonable and necessary. Four Seasons provided no evidence to rebut the medical-necessity presumption. Accordingly, the Court finds Four Seasons must provide Mr. Smiley the treatment recommended by Dr. Jayaraman, assuming he opines Mr. Smiley's condition resulted from the workplace accident.

Concerning temporary disability benefits, the Court finds Mr. Smiley failed to carry his burden of proving entitlement to those benefits because he failed to establish medical causation. An employee is entitled to receive temporary total disability benefits pursuant to Tennessee Code Annotated § 50-6-207(1) whenever the employee has suffered a compensable, work-related injury that has rendered the employee unable to work. *See Simpson v. Satterfield,* 564 S.W.2d 953 (Tenn. 1978).

Here, Dr. Jayaraman issued workplace restrictions that, among other limitations, prohibited Mr. Smiley from commercial driving. Although he did not take him off from work completely, Four Seasons presented no evidence that it offered Mr. Smiley light-duty work. Because he could not drive commercially and Four Seasons offered no accommodating work, Mr. Smiley earned no income despite technically having the ability to work. Because Mr. Smiley could work, but Four Seasons did not offer him light-duty work, his recovery would lie in temporary partial disability. However, because Mr. Smiley does not have an expert medical opinion on the cause of his back condition, he cannot recover temporary partial disability benefit at this time.

**IT IS, THEREFORE, ORDERED** as follows:

1. Four Seasons shall provide Mr. Smiley medical care with the authorized treating physician, Dr. Jayaraman.

2. Mr. Smiley's request for temporary disability benefits is denied at this time due to the lack of an opinion on medical causation.

3. This matter is set for an Initial (Scheduling) Hearing on June 20, 2016, at 8:30 a.m. (CDT).

4. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2015). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

11

5. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471.

**ENTERED ON THIS THE 25ᵀᴴ DAY OF MAY, 2016.**

_____

**Judge Joshua Davis Baker**
**Court of Workers' Compensation Claims**

Initial Hearing:

An Initial (Scheduling) Hearing has been sent for **June 20, 2016, at 8:30 a.m. Central Time** with **Judge Joshua Davis Baker, Court of Workers' Compensation Claims. You must call 615-741-2113 or toll free at 855-874-0474 to participate in the Initial Hearing.**

**Please Note:** **You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk within seven business days of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a filing fee in the amount of $75.000. Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing

fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

## APPENDIX

Exhibits:

1. Medical Records of Shane Smiley
2. Affidavit of Shane Smiley
3. Copy of Tennessee Public Chapter 188
4. Collective Exhibit
5. Letter from Dr. Kevin Sneed
6. Recorded Statement Transcript
7. Tour Bus Rental Contract

Technical Record:

1. Petition for Benefit Determination – Four Seasons (Docket No. 2016-06-0104)
2. Petition for Benefit Determination – Live Soul (Docket No. 2015-06-0106)
3. Dispute Certification Notice – Four Seasons
4. Dispute Certification Notice – Live Soul
5. Request for Expedited Hearing – Four Seasons
6. Request for Expedited Hearing – Live Soul

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent to the following recipients by the following methods of service on this the 25 th day of May, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|------|------|------|------|
| **Shane Smiley** | x | | x | 4220 Brush Bill Rd.<br>Nashville, TN 37216<br>shane.alan.smiley@gmail.com |
| **Stacy Miller** | | | x | smiller@adhknox.com |
| **Cole Stinson** | | | x | cstinson@accidentfund.com |

**Penny Shrum, Clerk**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**

15