FILED
07/07/2023
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2023 Session

## TRAVIS G. BUMBALOUGH v. RACHEL M. HALL

**Appeal from the Putnam County Juvenile Court
No. 2021-PAT-12   Steven D. Qualls, Judge**

_____

**No. M2022-01003-COA-R3-CV**

_____

This appeal arises from a petition to establish parentage and a parenting plan pursuant to Tennessee Code Annotated § 36–2–311 for a child born out of wedlock. In finding that the statutory best interest factors set forth in Tennessee Code Annotated § 36-6-106(a) favored the father, the trial court designated the father as the primary residential parent of the parties' minor child and ruled that the child would live with the father in Tennessee during the school year and spend the majority of the summers and holidays with Mother in Texas. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the court, in which CARMA DENNIS MCGEE and JEFFREY USMAN, JJ., joined.

John David Haines, for the appellant Rachel Marie (Hall) Morris.[1]

Michael Robert Giaimo, for the appellee Travis Glenn Bumbalough.

### OPINION

#### FACTS AND PROCEDURAL BACKGROUND

Lucas—a minor child—was born to Rachel Marie (Hall) Morris ("Mother") and Travis Glenn Bumbalough ("Father") in October 2016. Although Mother and Father were

_____

[1] At the time of filing, the Appellant's surname was "Hall." She subsequently married and took the name "Morris."

1

never married, Father was present during the birth, even "cutting the cord" and signed a Voluntary Acknowledgment of Paternity at the hospital.

Immediately after Lucas's birth, Mother, Father, and Lucas lived with Mother's parents in Gallatin, Tennessee, where they remained for one month after which they relocated to Cookeville, Tennessee, where they resided with Father's parents for the next two years. During this time, Father worked and Mother stayed home with Lucas. During this time, Mother experienced the "baby blues." While this did not affect Mother's ability to parent Lucas, Father's extended family members often came to the parties' home to assist Mother in caring for Lucas. Additionally, Father and Lucas's paternal grandmother, Sheila Bumbalough, would frequently come home from work to assist Mother with Lucas during their lunch breaks.[2]

In April 2019, Mother and Father bought a home together in Gallatin, Tennessee, at which time Mother began working at a nursing home in the area. They resided together for the first three and one-half years of Lucas's life; however, in October 2019, Mother ended their relationship. After their separation, Father stayed in their residence while Mother moved in with her parents in Gallatin. After the breakup the parties shared virtually equal time with Lucas.

Mother then became romantically involved with Randall Morris—the administrator of the nursing home facility where she worked. Thereafter, staff from the nursing home complained that Mr. Morris was treating Mother favorably due to their romantic involvement, and the nursing home opened up an investigation into their relationship. Although there were no adverse findings, both Mother and Mr. Morris resigned from their respective positions at the nursing home and began new jobs in Tennessee. A few months later, however, they both resigned from their new positions.

In February 2020, Mother and Mr. Morris were engaged. After their engagement, Mr. Morris accepted a six-figure job offer in Texas. On February 18, 2020, Mother sent Father an email informing him that she was unilaterally changing the fifty-fifty custody schedule, wherein Father would only have seven days per month with Lucas. In her email, Mother stated that Lucas was regressing due to his back and forth movement between households. She further stated that Lucas was not sleeping well, forgetting how to count numbers, misbehaving at school and speaking gibberish. As the trial court noted in its final order, Father strongly objected to this change and insisted that he had not witnessed any of this behavior from Lucas.

Mother and Mr. Morris relocated from Tennessee to Comal, Texas in March 2020 because Mr. Morris had accepted a job there; however, Father was unaware of Mother's move until he received a letter from Mother on April 9, 2020. Although Mother belatedly

---

[2] The parties dispute the frequency of these visits on Father's part.

informed Father of her move to Texas, she had cancelled her previous cell phone service and did not provide her new cell phone number or a mailing address for Father to contact her or to speak with Lucas.[3] As a result, nine days passed before Father was able to communicate with Lucas.

Mother testified that the move to Texas was due to the fact that her employment as a nurse put her on the front lines during COVID, and that relocating to Texas would allow her to work from home, stay in a home owned by Mr. Morris's family, and pay very little rent. Mother also testified that the move would allow Mr. Morris to work in a job where he was insulated from COVID. Mother and Mr. Morris were married in April 2020.

On April 6, 2020, Father initiated this action by filing a petition to establish paternity and residential parenting for Lucas before the Circuit Court of Sumner County. In May of 2020, the Circuit Court for Sumner County entered an order establishing paternity and granting a temporary fifty-fifty visitation arrangement whereby Lucas would fly back and forth between Texas and Tennessee and would alternate spending twenty-eight days with each parent. In June of 2020, after Father returned to Cookeville, the Sumner County Circuit Court entered an order transferring this case to the Juvenile Court for Putnam County.[4]

Shortly thereafter, the Juvenile Court for Putnam County (hereinafter "the trial court") held a final hearing on the amended petition and modified the schedule to have Lucas spend forty-two-day periods with each parent. That arrangement remained in place until this matter came on for trial in June 2022.

In January 2021, Mother and Mr. Morris had a child together. Mother testified that Lucas and his half-brother have a close, loving relationship. Additionally, Mother testified that Lucas has built relationships in Texas with Mother's in-laws, as well as Mr. Morris's parents. However, Lucas also has a strong bond with his family in Tennessee. Virtually all of Father's extended family lives in Cookeville, Tennessee, and Lucas has spent a large portion of his young life with Father's family. Throughout Lucas's life, Father's family has gotten together several times a week to share meals, and Lucas's paternal grandparents take Lucas to the beach multiple times per year. Lucas is particularly close with his paternal grandmother, Sheila Bumbalough, and his great aunt, Barbara Roberts.

On June 22, 2022, the trial court held a final hearing on Father's Amended Petition to Establish Paternity and Residential Parenting for Lucas. After weighing the statutory best interest factors set forth in Tennessee Code Annotated § 36-6-106, the trial court

---

[3] Mother testified that she chose to obtain a Texas phone number. She also testified that the house they moved to in Texas was not registered with the post office. Thus, she had to use a Post Office Box number for written correspondence until a street address was assigned.

[4] The case was transferred to Putnam County where Father had just moved because both parents had left Sumner County and Father was the only parent residing in Tennessee at the time.

entered a final order designating Father as the primary residential parent, granting Father custody of Lucas in Tennessee during the school year, and granting Mother custody in Texas during school breaks. The trial court also vested Father with decision making authority for educational decisions and set child support based upon the parties' roughly equal annual incomes.

In its analysis, the trial court found that most statutory factors weighed equally for the parties or were not relevant; however, other factors favored Father. The court was primarily influenced by the fact that the parties lived in Tennessee when they met, that Lucas was born in Tennessee, that Tennessee was the home of the parties for several years, and the strong family relationships and community ties that Lucas has in Tennessee as opposed to Texas. Additionally, the court expressed concerns about Mother's willingness to facilitate and encourage a close and continuing parent-child relationship between Lucas and Father. The trial court's best interest findings include the following:

> As to each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parent to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the Court has no question that either parent will continue exceptional parenting abilities while Lucas is in his or her care. The Court is confident from the evidence of Father's text messages to the Mother and his lengthy testimony that he will encourage Lucas to have a good relationship with his Mother. The Court has concerns about the Mother's reciprocity in that encouragement. Mother's demeanor regarding this issue and others was very flat and matter of fact. Mother even testified that she believes that "my relationship as a mother is more important than his as a father." The Court also finds that Mother was not encouraging of the Father/son relationship when she abruptly left Tennessee and moved to Texas without even telling the Father. Lucas went nine days without being able to speak to his father. Even though the Mother had the legal right to move to Texas, the way she did it as it pertained to the child and his relationship with his father, who was exercising 50% parenting time, was not in the child's best interest. Encouraging and facilitating a future parent and child relationship clearly favors the Father.

After finding that both "parents are quite capable of providing Lucas with food, clothing, medical care, education and any other necessary care that he may need," and that they have "been equal caregivers of Lucas since his birth," and that "both parents have a strong love and affection for Lucas as he does with his parents," the court went on to find:

> Taking into account the emotional needs and developmental level of Lucas, the Court was impressed with the testimony of Tammy Fontenot, who has been the owner of London Bridge Daycare for 25 years. Mrs. Fontenot

testified that Lucas is developmentally ready for kindergarten without reservation. She testified that Lucas is a very smart and loving child, has an excellent relationship with his classmates, 12 of which he started daycare with as a baby. Mrs. Fontenot was clear that in February of 2020, that Lucas was not "regressing" as testified to by the Mother. He had no sleep issues at daycare, he was not forgetting his numbers, nor was he speaking "gibberish", pushing kids at school or acting out in any way. Her testimony was just the opposite of what Mother claimed in her email to Father about the "regression". Father also testified that there was no regression as referenced by the Mother. In fact, Mother testified that now Lucas is extremely loving, outgoing, developmentally on target, kind, shares with others and is obedient. Mother also testified that Father helped develop these characteristics in Lucas, all while splitting time with parents who live 1,500 miles apart. This Court finds that Mothers claim of the regression is unfounded and this was part of the plan by Mother to minimize Fathers equal time in her quest to leave for Texas with her fiancé.

.     .     .     .

The issue of the child's interactions and interrelationship with siblings, other relatives and step-relatives, and mentors as well as the child involvement with the child's physical surroundings, school, or other significant activities weighs heavy on this Court. Lucas has a 16-month-old half sibling in Texas that he undoubtedly loves. Due to the young ages of the parties there is very good likelihood that he will have more half siblings from either of both parents. Lucas also has a step-father that appears to care for him very much. Mother testified that Lucas has step-grandparents, step aunts and uncles and step-cousins that live near them In Texas. There are no other blood relatives living near them. Her parents now live in Florida and visit infrequently. Mothers testimony was that her parents have visited three to four times ln that last 2.25 years. The Court finds that Lucas has an extraordinary relationship with his relatives in Tennessee, specifically in Cookeville. The paternal grandmother, Sheila Bumbalough, testified that her son, the Father, was an only child and Lucas is their only grandchild. The family lives on a small farm where the Father grew up. Grandmother and her sister share a swimming pool between their homes that Lucas loves. The families constantly get together and share meals several times per week. The grandparents also take the Father and Lucas to the beach at least two times per year. Mrs. Bumbalough's love for Lucas was very evident in her emotional testimony. His great aunt, Barbara Roberts, also testified that she has been a big part of Lucas life since he was born. Lucas comes to her house often, which is at the Cookeville Country Club. She and her husband spend quality time with Lucas and he loves riding her husband motorized cart,

playing golf and swimming at the pool. Lucas nicknamed her "Darling" at an early age. Her love for Lucas was very evident. Lucas and his Cookeville family have deep, deep roots and the love they have for him and the relationships they share are overflowing. Lucas has spent the majority of his young life in Cookeville. The Father testified that Lucas knows many people in town upon seeing them because of their history here and their love for Lucas. The Court was very impressed by such obvious love, care and involvement this family has in Lucas's life. Although Lucas has just graduated from London Bridge Daycare, the Court was impressed by the testimony of Mrs. Fontenot. Even she has a personal love for Lucas, one of 79 of her students. She said he is a model student and his classmates miss him when he's gone for six weeks and ask about him. She has discussed with the Father about Lucas attending Park View Elementary school and it being a good fit for Lucas. This statutory factor clearly weighs heavily in the Fathers favor and is a significant best interest factor for the Courts consideration in this case.

Having considered the above factors, as well as other factors the court found to favor both parents equally, the court reasoned:

The Court has thoroughly considered the testimony and the evidence presented in this case. The Court, after applying the statutory factors in TCA § 36-6-106, finds that both parents would be equally fit for raising Lucas as the primary residential parent. However, even though the statutory factors are close to equal for the parents in most areas, the factors slightly favor the Father. Therefore, the Court designates the Father, Travis Bumbalough, as the primary residential parent of Lucas, said designation being in the best interest of the child. The Courts strongest considerations were the family relationships and community ties that Lucas has in Tennessee as opposed to Texas. The Court also considered the fact that the parties lived In Tennessee when they met, Lucas was born in Tennessee and Tennessee was the home of the parties for several years. The Court was also swayed by the testimony of the Mother and feels that she would not facilitate and encourage a close and continuing relationship with the Father. On the contrary, the Court was compelled by not only by the testimony of the Father but his past actions and texts messages that he will undoubtedly encourage and facilitate a close relationship with Lucas and the Mother.

Based on the above and other findings, the court ruled that Lucas would live with Father in Tennessee during the school year and spend the majority of the summers and holidays with Mother, including Spring and Fall school breaks. Further, the court ordered, "Father shall make the educational decisions, both parties will make non-emergency health care decisions and extracurricular decisions when Lucas is in his or her respective care,

and both will make religious upbringing decisions for Lucas and they will equally divide any uncovered medical expenses." The court also set child support and ordered counsel to draft a Permanent Parenting Plan consistent with its rulings.

This appeal followed.

## ISSUES

Mother raises one issue for our consideration, stated as follows:

Whether the trial court erred by designating a father with no prior custody order the Primary Residential Parent of a minor child born out of wedlock where the Mother relocated from Tennessee to Texas when Child was approximately three and one-half years old.

## STANDARD OF REVIEW

Decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors. *Holloway v. Bradley*, 230 S.W.2d 1003, 1006 (Tenn. 1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997). Trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are therefore better positioned to evaluate the facts than appellate judges. *Rousos v. Boren*, No. M2013-01568-COA-R3-CV, 2014 WL 4217415, at *11 (Tenn. Ct. App. Aug. 26, 2014); *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, decisions regarding parenting plans are "peculiarly within the broad discretion of the trial judge." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

Discretionary decisions are reviewed under the "abuse of discretion" standard of review. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). The abuse of discretion standard does not permit reviewing courts to substitute their discretion for the trial court. *Id.* Nevertheless, the abuse of discretion standard of review does not immunize a lower court's decision from meaningful appellate scrutiny:

Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

7

*Id.* (citations omitted). Discretionary decisions require "a conscientious judgment, consistent with the facts, that takes into account the applicable law." *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015) (citing *Lee Med., Inc.*, 312 S.W.3d at 524).

Thus, we will review the trial court's decision to designate Father as the primary residential parent and determine, where applicable, whether there is a factual basis for the decision in the record, whether the court properly identified and applied the correct legal principles, and whether the decision is within the range of acceptable alternative dispositions.[5] *See Lee Med., Inc.*, 312 S.W.3d at 524.

When "[a]pplying this framework, we look first at whether the factual basis for the trial court's decision is supported by evidence in the record." *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 306 (Tenn. 2020). We "review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d)." *Lee Med., Inc.*, 312 S.W.3d at 525. We then look at whether the trial court identified and applied the correct legal principles relevant to its decision. *See Harmon*, 594 S.W.3d at 306. Our review of the trial court's legal determinations is "de novo without any presumption of correctness." *Lee Med., Inc.*, 312 S.W.3d at 525. Finally, we look at "whether the [trial] court's decision was in the range of acceptable alternative dispositions." *Id.* When doing so, we are mindful of the inherent limitations in the abuse of discretion standard:

> [B]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen. Accordingly, if the reviewing court determines that reasonable minds can disagree with the propriety of the decision, the decision should be affirmed.

*Harmon*, 594 S.W.3d at 306 (quoting *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019)).

---

[5] In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court provided a framework for determining whether a trial court properly exercised its discretion:

> [R]eviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

*Id.* at 524.

ANALYSIS

"The procedure for establishing parentage and custody for a child born out of wedlock is governed by Tenn. Code Ann. § 36–2–311." *Graham v. Vaughn*, No. M2012-01982-COA-R3CV, 2014 WL 356975, at *2 (Tenn. Ct. App. Jan. 30, 2014). "Once the parentage of the child is established, parental access is to be determined pursuant to Chapter 6 of Title 36." *Id*. (citing Tenn. Code Ann. § 36–2–311(a)(10)).

In any Tennessee proceeding "where the custody of a minor child or minor children is a question," Tenn. Code Ann. § 36-6-101(a)(1), the court must "make a custody determination," *Armbrister*, 414 S.W.3d at 693. "By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004)).

In doing so, the trial court must determine which of the parents is comparatively more fit to have primary residential responsibility of the child. *See Grissom v. Grissom*, 586 S.W.3d 387, 392 (Tenn. Ct. App. 2019) (quoting *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006)) ("In choosing which parent to designate as the primary residential parent for the child, the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other."). In engaging in this analysis, the court must consider the relevant factors set out in Tennessee Code Annotated § 36-6-106(a). *Chaffin*, 211 S.W.3d at 286 (footnote omitted).

When the petition was filed in this case, the statute identified the following fifteen factors[6] to be considered by the court in determining child custody:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

---

[6] Father's petition was filed in March 2020. The General Assembly amended the statute effective March 18, 2022, by adding a sixteenth factor. *See* 2022 Tenn. Laws Pub. Ch. 671 (H.B. 1866), eff. March 18, 2022. Courts consider the factors in effect at the time the petition was filed. *See C.W.H. v. L.A.S.*, 538 S.W.3d 488, 497–98 (Tenn. 2017) (noting that statutes are presumed to operate prospectively and not retroactively, unless the statute is procedural in nature). Nevertheless, the sixteenth factor, "[w]hether a parent has failed to pay court-ordered child support for a period of three (3) years or more," is inapplicable to the facts of this case. Tenn. Code. Ann. § 36-6-106(a)(16).

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child…;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child…;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person…;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request.

The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules;

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

Mother's one issue has several subparts in that she challenges the trial court's findings of fact concerning several of the best interest factors. Her principal contentions are that the trial court erred in finding that best interest factors (2) and (9) clearly favored Father and, in this regard, she contends that the trial court erred as a matter of law by separating Lucas from his half-sibling based on her assertion that there is a "well settled preference of courts in this state to place half-siblings together." Furthermore, she contends that the trial court's findings concerning factor (7) are not supported by the record, and that these findings erroneously "influenced the trial court's analysis under factor (2)." Mother also contends that factors (1), (5), (8), and (10) favor her while the trial court erroneously found they favored neither parent. Mother does not challenge the trial court's analysis of factors (4), (6), (11), (12), and (14), and agrees that factors (3) and (13) do not apply to the facts of this case. We will discuss the relevant factors in turn.

Factor (9):  We begin our discussion by addressing Mother's primary contention that the trial court misapplied the law in determining that best interest factor (9) favored Father. Factor (9) concerns the child's "interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities." Tenn. Code Ann. § 36-6-106(a)(9). In its analysis of this factor, the trial court discussed Lucas's relationship with his half-sibling, stating:

The issue of [Lucas's] interactions and interrelationship with siblings, other relatives and step-relatives, and mentors as well as [Lucas's] involvement with [Lucas's] physical surroundings, school, or other significant activities weighs heavy on this Court. Lucas has a 16-month half sibling in Texas that he undoubtedly loves. Due to the young age of the parties there is a very good likelihood that he will have more half siblings from either or both parents.

The trial court then discussed in detail Lucas's familial relationships in Texas and Tennessee. Based on the deep roots that Father's family has in Cookeville and Lucas's

11

"extraordinary relationship with his relatives in Tennessee, specifically in Cookeville", the court found that best interest factor (9) "clearly weighs heavily in Father's favor."

In her brief, Mother suggests that this conclusion was in error because, she contends, there is a "well settled preference of courts in this state to place half-siblings together." We note, however, that Mother cites no authority to support this contention and we have found no authority that supports Mother's half-sibling argument.

Generally speaking, Tennessee courts have held that it is not appropriate to separate siblings by a custody order. *Baggett v. Baggett,* 512 S.W.2d 292, 293–94 (Tenn. Ct. App. 1973); *Richardson v. Richardson,* No. W2000-02374-COA-R3-CV, 2001 WL 687074, at *5 (Tenn. Ct. App. June 14, 2001) (citing *In re S.B.,* No. M1999-00140-COA-R3-CV, 2000 WL 575934, at *5 (Tenn. Ct. App. May 12, 2000)). However, while there is a presumption against separating siblings, this principle must give way to other considerations if the best interest of a child so dictates. *Id.*; *Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at *14 (Tenn. Ct. App. Dec. 21, 2012) ("As this court has recognized on several occasions, a parenting schedule that separates siblings is discouraged; however, the best interests of the child should be the foremost consideration."). Indeed, it is well established that the preference for siblings to remain together is not a controlling factor. *In re S.B.,* No. M1999-00140-COA-R3-CV, 2000 WL 575934, at *5 (Tenn. Ct. App. May 12, 2000). Rather, sibling relationships are "simply a factor for the court to consider in determining the best interest of the child." *Id; see In the Matter of M.W.A.,* 980 S.W.2d 620, 623 (Tenn. Ct. App. 1998) (keeping siblings together was only one of the three factors the court used in determining the children's best interest).

In the case at bar, the trial court applied the appropriate statutory factor, and, citing to the facts in the record, found that Lucas's familial relationships in Tennessee were "a significant best interest factor for the court's consideration in this case." Moreover, Mother's contention that all half-siblings must be placed together in a custody arrangement is unworkable. For example, if one of the parents was to marry three times or both parents married twice and have multiple children with each new spouse, it would be plainly unworkable for the courts to fashion a custody arrangement that allowed each child to remain with all of their half-siblings. Thus, we find no merit to Mother's contention that the trial court erred, as a matter of law, by separating Lucas from his half-sibling.

As for the trial court's findings of fact concerning factor (9), which pertains to the child's interactions and interrelationship with siblings, other relatives and step-relatives, and mentors as well as the child involvement with the child's physical surroundings, school, or other significant activities – the court made extensive findings which we quoted

earlier in this opinion. In pertinent part, the trial court found that Lucas has a step-father that appears to care for him very much as well as step-grandparents, step aunts and uncles and step-cousins that live near them in Texas; however, there are no other blood relatives living in Texas and Mother's parents live in Florida and visit infrequently. By contrast, the court found that Lucas has an extraordinary relationship with his relatives in Tennessee, specifically in Cookeville where Father grew up and where his extended family constantly gets together and share meals several times per week. The court specifically noted that Sheila Bumbalough's love for Lucas was very evident from her emotional testimony. Further, his great aunt, Barbara Roberts, has been a big part of Lucas's life since he was born and Lucas visits her house often where she and her husband spend quality time with Lucas. Further, the court found that Lucas and his Cookeville family have deep roots and the love they have for him and the relationships they share are overflowing. Based on these and other findings of fact, the court found that this statutory factor clearly weighed heavily in the Fathers favor and that it was a significant best interest factor for the court's consideration in this case.

Having reviewed the record, we find the evidence preponderates in favor of the trial court's finding as to factor (9).

Factors (1) and (5): Best interest factors (1) and (5) both consider the extent of each party's parenting involvement. *See* Tenn. Code Ann. § 36-6-106(a)(1) ("The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child"); Tenn. Code Ann. § 36-6-106(a)(5) ("The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities"). Thus, we will consider them in tandem.

With respect to factor (1), the trial court found that "Lucas has a very good relationship with his Father and Mother", and that while "both parents shared equally in the parenting responsibilities while the parties were together", Mother "may have spent 51% of the time with Lucas for a very short time while Father was working outside the home earning a living." As for factor (5), the trial court found that "the parties have been equal caregivers of Lucas since his birth", although Mother "may have spent 51% of the time with Lucas during short periods of time while the Father was working." However, the court also found that "Father took responsibilities for Lucas as soon as he came home from work and all other times" and "both parents were involved in Lucas['s] medical care", with Mother taking Lucas to the appointment and Father meeting them there on almost every occasion.

13

Mother argues that she has performed the majority of parenting responsibilities because she has been a stay at home mom periodically throughout Lucas's life while Father worked, and because she had custody of Lucas for approximately 75% of February and March of 2020. Mother also claims that she took greater responsibility for performing parental responsibilities because she spent fifty-one percent of the time with Lucas and "was present at every doctor appointment, for the full duration of the appointment, with Father arriving later on "almost every occasion."

As to Mother's first argument, this court has noted that a mother's care for a child during the early months of a child's life does not, by itself, make the mother the primary caregiver. *Brown v. Brown*, 571 S.W.3d 711, 723 (Tenn. Ct. App. 2018). Thus, although Mother stayed home with Lucas immediately after his birth, and the parties dispute the frequency with which Father returned home during lunch to help care for Lucas during this time, Mother's care for Lucas during this period alone does not make her the primary caregiver. Moreover, and significantly, the reason that Mother had custody of Lucas for seventy-five percent of February and March 2020 was because she unilaterally changed the parties' custody schedule against Father's strong objection and moved to Texas with Lucas without notice to Father.

Mother's argument that she has taken the greater responsibility for performing parental responsibilities is also unconvincing. In *Brown v. Brown*, this court found that Tennessee Code Annotated § 36-6-106(a) factors (1) and (5) favored the mother in that case because the mother was primarily responsible for the parties' child for fifty-eight percent of the time. *Id.* Here, by contrast, Mother states that she was primarily responsible for Lucas fifty-one percent of the time. The trial court did not consider a one-percent difference in parenting involvement to be substantial enough to find that Mother performed the majority of parenting responsibilities and the evidence in the record preponderates in favor of the trial court's finding as to factors (1) and (5).

Factors (2) and (7):  Tennessee Code Annotated § 36-6-106(a)(2) concerns "[e]ach parent's . . . past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents". A trial court is to consider in this analysis "the likelihood of each parent . . . to honor and facilitate court ordered parenting arrangements . . . and . . . any history of either parent . . . denying parenting time to either parent in violation of a court order." *Id.* Factor (7) focuses on the emotional needs and developmental level of the child. *See* Tenn. Code Ann. § 36-6-106(a)(7).

Mother presents multiple arguments in regard to the trial court's analysis of factor (2). First, Mother claims that the trial court allowed its analysis of this factor to be influenced by its analysis of factor (7). Namely, Mother argues that the trial court held Mother's relocation to Texas against her, effectively "punishing" her, by concluding that

14

her email to Father concerning Lucas's regression was a fabrication and part of a larger plan to limit Father's time with Lucas.

Parenting plans should never be used to punish or reward the parents for their human frailties or past mis-steps. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App. 1972). Instead, parenting plans should be used to advance the children's best interests by placing them in an environment that best serves their physical and emotional needs. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). *Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004).

Because Mother claims that the trial court allowed its analysis of factor (2) to be influenced by its analysis of factor (7), we begin with a discussion of the trial court's findings concerning factor (7), which concerns the emotional needs and developmental level of the child.

As for factor (7), the trial court found that this factor weighed in favor of Father. Citing the deposition testimony of London Bridge director Tammy Fontenot, in which she testified that Lucas was doing well developmentally and was ready for kindergarten, the court found that Lucas had not been "regressing" as testified to by Mother. Rather, the court posited that "Mother's claim of regression is unfounded" and that "this was part of the plan by Mother to minimize Father's equal time in her quest to leave for Texas with her fiancé." Mother notes that, in its final order, the trial court stated, "Mrs. Fontenot was clear that in February of 2020, Lucas was not 'regressing' as testified to by Mother." Mother argues that Mrs. Fontenot did not testify to that fact.[7] Instead, Mother insists that the record indicates that Lucas was not enrolled in London Bridge from late 2018 to May 2020.

Here, the trial court's conclusion that Mother's claim of regression was "unfounded" was based, in part, on the court's implicit finding as to Mother's credibility. We afford considerable deference to this finding. As to Mrs. Fontenot's deposition testimony, because this is documentary evidence, we will draw our own conclusions with regard to the weight and credibility of her testimony. See *Excel Polymers, LLC v. Broyles,* 302 S.W.3d 268, 271 (Tenn. 2009); *Bohanan v. City of Knoxville,* 136 S.W.3d 621, 624 (Tenn. 2004). Mrs. Fontenot testified that Lucas had been attending the London Bridge school since 2017, but that there was a break in 2018, when Lucas was about two. Lucas

---

[7] Mother asks that this Court to take judicial notice of the fact that Lucas would have been two years old in October of 2018. Ms. Fontenot's exact testimony was that she "had Lucas prior" and in response to a question that she had Lucas "until two years old" Mrs. Fontenot's response was "[s]omething on that time frame".

started back up in the program in 2020 and would attend for six-week periods at a time when Father had custody of him. Mrs. Fontenot testified that she could not remember the month that Lucas had started back up, but that she had shut down the school for five (5) weeks from the end of March to May due to the pandemic. However, she stated that this was "before Lucas started." Thus, the trial court's statement that, "Mrs. Fontenot was clear that **in February of 2020**, Lucas was not 'regressing' as testified to by Mother" does not appear to be supported by the record. (Emphasis added). Despite the confusion as to the date, we find that the trial court properly considered Mrs. Fontenot's testimony in determining the emotional needs and development of Lucas. Mrs. Fontenot testified generally that, during the time that Lucas attended London Bridge school, Lucas "always behaved well" and that he was on target developmentally. This is on par with Mother's testimony that, as of now, Lucas is "extremely loving, outgoing, developmentally on target, kind, and shares with others."

Having reviewed the record, we find the evidence preponderates in favor of the trial court's overall finding concerning factor (7).

We now turn our attention to factor (2). Here, it is clear that the trial court's main consideration in evaluating factor (2) was Lucas's bests interest and the record does not indicate that the trial court was punishing Mother for moving to Texas. Rather, it is readily apparent that the trial court was evaluating Mother's likelihood of reciprocity in encouraging a close parent child relationship between Father and Lucas. The secretive manner in which Mother moved to Texas did not reflect a willingness to encourage their relationship. Neither did Mother's testimony wherein she directly stated that her relationship with Lucas was more important than Father's relationship with Lucas. The trial court's logic was clear as to this factor, and there is nothing in the record to indicate that this decision was based on a desire to punish Mother. Instead, it is apparent that the finding was factually based on the court's assessment of Mother's unilateral actions and communications.

Second, Mother claims that the trial court ignored inconsistencies in Father's testimony and spoke about Father in "a broad positive manner" while not affording Mother the same degree of deference. Although the trial court did not make any explicit credibility findings in its final order, "in some cases, we may assume that the trial court found one party more credible than another due to the trial court's decision". *Kerst v. Upper Cumberland Rental and Sales*, LLC, No. M2014-00894-COA-R3-CV, 2015 WL 1416171, at *3 (Tenn. Ct. App. Mar. 25, 2015). That is obviously the case here.

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of

16

witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013).

Here, the final order reflects an implicit credibility finding in Father's favor. While Mother argues that inconsistencies in Father's testimony present clear and convincing evidence that Father is not a credible witness, she has failed to identify evidence which we find clear or convincing. To the contrary, we find the evidence preponderates in favor of the trial court's implicit finding. *See State v. Binette*, 33 S.W.3d at 217 (We extend a high degree of deference to trial courts' credibility determinations, and we will not overturn such determinations absent clear and convincing evidence to the contrary).

We also note that the trial court's findings on this issue are based in part on documentary evidence, and appellate courts are not required to give similar deference to a trial court's findings of fact based on documentary evidence such as depositions, transcripts, or video recordings. *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014). When findings are based on documentary evidence, an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court. *Id.* Accordingly, when factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence. *Id.*

In her appellate brief, Mother relies on Exhibits 1 and 3 as serving to undermine Father's oral testimony that he did not see any regressing behaviors from Lucas. In Exhibit 1, Father was upset that Mother would insinuate that he was responsible for any regression. In Exhibit 3, Father stated that he did not know why the parties could not go back to their original fifty-fifty schedule. To this, Mother responded "Lucas still needs the schedule that he is currently on. There are still regressions I am working with him on very routinely", to which Father replied, "I can work with him just as much as you can." Father does not contradict his oral testimony in these exhibits. Rather, it is clear that Father was merely attempting to work with Mother and find a way to get back to the parties original parenting plan. We are unpersuaded by Mother' reliance on these two exhibits as was the trial court.

Third, Mother argues that the trial court erred in finding for Father on factor (2) because there is no evidence that Mother's tone of voice or opinions of her role in Lucas's life have negatively impacted Lucas. Factor (2) does not evaluate whether or not a parent's demeanor, tone of voice, or opinions negatively affect a child. Instead, it considers whether

a parent will be willing to facilitate a close parent child relationship between the child and the other parent. Mother's testimony regarding her role in Lucas's life as opposed to Father's and whether she would likely work with Father to facilitate a close relationship between Lucas and Father reveals Mother's reluctance to foster a compatible co-parenting relationship, as found by the trial court. Thus, the trial court properly took these facts into consideration in its evaluation of factor (2).

Mother also argues that her two-year compliance with the court's parenting order is the best evidence of her willingness to co-parent, and that the text messages which the trial court found favorable to Father likewise paint Mother in a favorable light. As to her compliance with the parenting plan, Mother cites the portion of Tennessee Code Annotated § 36-6-106(a)(2) that directs trial courts to consider "any history of either parent or any caregiver denying parenting time to either parent in violation of a court order" in its evaluation of factor (2). Here, both parties complied with the parenting order. Even if the trial court had considered Mother's past compliance with the parenting order in their evaluation of factor (2), it would have found that this fact also weighed equally in Father's favor. Similarly, even if the trial court had found that the text messages that it found favorable to Father also reflected positively on Mother, this finding would not have tipped the scale in Mother's favor.

Having reviewed the record, we find the evidence preponderates in favor of the trial court's finding concerning factor (2) as well as factor (7). Furthermore, we find no merit to Mother's contention that the trial court erroneously allowed its analysis of factor (2) to be influenced by its analysis of factor (7).

Factor (4):  The trial court found that factor (4) weighed equally for the parties, since both parents are capable of providing Lucas with food, clothing, medical care, education, and any other necessities that he may need. *See* Tenn. Code Ann. § 36-6-106(a)(4) ("The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care"). Additionally, the court found that both parents are involved in Lucas's pre-K education. Mother does not dispute this and the evidence in the record preponderates in favor of this finding.

Factor (6):  With respect to factor (6), the trial court found that "both parents have a strong love and affection for Lucas as he does with his parents." *See* Tenn. Code Ann. § 36-6-106(a)(6) ("The love, affection, and emotional ties existing between each parent and the child"). Mother does not dispute this and the evidence in the record preponderates in favor of this finding.

Factors (8) and (10):  As for factor (8), the court found that "each parent is morally, physically, and emotionally fit to parent Lucas." *See* Tenn. Code Ann. § 36-6-106(a)(8) ("The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child…"). The court expressed concern that Father had moved a

girlfriend into the home where he and Lucas were residing; however, that relationship had ended. Moreover, the court dealt with this issue by ordering that "Father shall not have any paramours overnight in the home while Lucas is present."

As for factor (10), the trial court found that the six-week parenting schedule, although "somewhat stable and satisfactory", will no longer be workable for Lucas as he begins public school. *See* Tenn. Code Ann. § 36-6-106(a)(10) ("The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment."). Thus, the court stated that "Lucas will require a more stable schedule where he will spend the school year with one parent and the majority of the summers and holidays with the other parent."

Mother argues that the trial court should have weighed factors (8) and (10) in her favor because Father's decision to introduce a girlfriend to Lucas so rapidly calls into question Father's emotional fitness and indicates an inclination to place his romantic desires above what is best for Lucas. Mother, however, concedes that this failed relationship does not approach the level of calling into question Father's overall fitness to parent. Similarly, the trial court did not find that Father's previous relationship made him unfit to parent Lucas. Instead, while the court expressed "concern" that Father moved a girlfriend into the home where he and Lucas resided, it noted that the relationship had ended and ordered that Father not cohabitate in the future.

The courts of this state have held that a court should not judge a parent by a standard of perfection. *Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004); *Morgan v. Morgan*, No. E2011-00164-COA-R3CV, 2012 WL 1939792, at *10 (Tenn. Ct. App. May 30, 2012). Here, the record demonstrates that Father has made Lucas a priority in his life. Additionally, Lucas has spent the majority of his life in Cookeville, and has significant family and community ties there. A single failed relationship is not sufficient to indicate that Father is emotionally unfit to parent Lucas or that his home is an unstable environment in which to raise Lucas. Thus, we find that the evidence in the record preponderates in favor of the trial court's finding as to factors (8) and (10).

Factor (11):  As for factor (11), the trial court found "no evidence of physical or emotional abuse to Lucas and there were no credible suggestions of any abuses." *See* Tenn. Code Ann. § 36-6-106(a)(11) ("Evidence of physical or emotional abuse to the child, to the other parent or to any other person…"). Mother does not dispute this and the evidence in the record preponderates in favor of this finding.

Factor (12):  In regard to factor (12), the trial court had "no concerns about anyone living in or frequenting the home of either party" as Father now "lives in his home with Lucas only", and Mother "lives in her home with her husband, their baby, and Lucas." *See* Tenn. Code Ann. § 36-6-106(a)(12) ("The character and behavior of any other person who

resides in or frequents the home of a parent and such person's interactions with the child"). Mother does not dispute this and the evidence in the record preponderates in favor of this finding.

Factor (14): Finally, in considering factor (14), the court noted that both parents work Monday through Friday and have flexible schedules with weekends and most holidays off. *See* Tenn. Code Ann. § 36-6-106(a)(14) ("Each parent's employment schedule, and the court may make accommodations consistent with those schedules"). The trial court found that both parents would be able to drop Lucas off at school and pick him up. Additionally, both Mother and Father have family that could assist them in picking up Lucas from school if needed. Mother does not dispute this and the evidence in the record preponderates in favor of this finding.

As noted above, we find the evidence preponderates in favor of the trial court's findings of fact concerning each of the best interest factors discussed above. Although the trial court found that more factors are favorable to Father, "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the [best interest] analysis." *Solima*, 2015 WL 4594134, at *4; *see also Paschedag v. Paschedag*, No. M2016-00864-COA-R3-CV, 2017 WL 2365014, at *5 (Tenn. Ct. App. May 31, 2017) (noting that custody litigation should not be decided "by simply tallying up wins and losses.").

As it concerns residential placement determinations, "the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting *Cummings v. Cummings,* No. M2003–00086–COA–R3–CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004)). In doing so, the trial court must determine which of the parents is comparatively more fit to have primary residential responsibility of the child. *See Grissom*, 586 S.W.3d at 392.

In determining that Father was better suited to function as Lucas's primary residential parent and that Lucas should reside with Father in Tennessee during the school year, the trial court focused on four factors with two of the factors being given the strongest consideration, those being the family relationships and community ties that Lucas has in Tennessee as opposed to Texas. The trial court also considered the fact that Lucas was born in Tennessee and Tennessee was the home of the parties for several years. The trial court was also swayed by the testimony of Mother and her actions, which indicated that she would not facilitate and encourage a close and continuing relationship with Father, while the trial court found that Father would undoubtedly encourage and facilitate a close relationship with Lucas and the Mother.

Given the broad discretion the trial court has in making this determination, we conclude that Mother has failed to demonstrate that the court abused its discretion or reached a decision that "'falls outside the spectrum of rulings that might reasonably result

from an application of the correct legal standards to the evidence found in the record.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge,* 42 S.W.3d at 88). Accordingly, we affirm the trial court's decision designating Father as the primary residential parent and adopting Father's proposed permanent parenting plan, as modified by the trial court.

## IN CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed in all respects. Costs of appeal are assessed against the appellant, Rachel M. (Hall) Morris.

_____
FRANK G. CLEMENT JR., P.J., M.S.